## FARR v. NORDMAN.

1. TAXATION—SETTING ASIDE SALE—LIMITATION OF ACTIONS.
   A landowner who has notice that his land has been sold for taxes and desires to have such sale set aside must take proceedings therefor within 1 year (CL 1948, § 211.70).

2. EQUITY—LIMITATION OF ACTIONS.
   One who has let his legal remedy be outlawed cannot obtain relief in equity.

3. TAXATION—SETTING ASIDE TAX SALE—QUESTIONS REVIEWABLE.
   Claimed errors as to findings on questions of fact in suit to set aside tax sale, relating to alleged partial payments where find-

---

REFERENCES FOR POINTS IN HEADNOTES
[1-3] 51 Am Jur, Taxation § 1111 et seq.

ings ·involved are adequately substantiated by the record, are not considered, as determination of such issues, one way or the other, could not alter the ultimate result, plaintiff having waited more than 1 year after receiving notice of tax sale before commencing proceedings to set it aside (CL 1948, § 211.-70).

4. COSTS—PUBLIC QUESTION—SETTING ASIDE TAX SALE.
   No costs are allowed in suit to set aside tax sale by landowner who failed to take proceedings within 1 year from receipt of notice of sale, a public question being involved (CL 1948, § 211.70).

SMITH and BLACK, JJ., dissenting.

Appeal from Kent; Verdier (Leonard D.), J. Submitted March 23, 1956. (Docket No. 90, Calendar No. 46,544.) Decided September 4, 1956.

Bill by Harold Farr and Evelyn Farr against Amos Nordman, Estate Management Corporation, Norman D. Holt and various public officials to set aside tax deed and to correct certain tax records. Bill dismissed. Plaintiff appeals. Affirmed.

*Floyd H. Skinner* and *Alphonse Lewis, Jr.,* for plaintiff.

*Thomas J. Whinery,* for defendant Nordman.

KELLY, J. Plaintiffs and appellants brought action to set aside a tax sale of 2 lots, of which they were the owners in 1947.

In December, 1947, plaintiffs received notice that the tax due on the lots amounted to $12 and, in order to avoid a further penalty of 3%, should be paid on or before January 10, 1948. Plaintiff Evelyn Farr testified that she was unable to pay the tax before the due date, but that in March, 1948, she sent to Vera Shipman, Plainfield township treasurer, a $10 bill and two $1 bills, and that she was subsequently

advised by Mrs. Shipman that the money had been sent to the courthouse. Mrs. Shipman denied receiving payment in the form of a $10 bill and two $1 bills, but said she did receive a money order for $12 which she returned to plaintiff because plaintiff had refused to pay the 3% penalty.

In May, 1950, the property was sold for taxes to defendant Amos Nordman, who acquired tax deeds on May 22, 1951. There is no claim of irregularity in the sale as such, nor that notices were not sent to plaintiffs. Nordman testified that he telephoned plaintiffs and tried to arrange for a redemption of the taxes, but met with little success.

On February 1, 1952, Nordman served notices as required by the provisions of CL 1948, § 211.140 (Stat Ann 1950 Rev § 7.198), advising plaintiffs that he had purchased the property for the unpaid taxes and that they were entitled to reconveyance of same at any time within 6 months upon payment of the amount due, plus 50% and costs, which amounted to a little over $35, and payable, as stated in the notice: "To the undersigned (Amos Nordman) or to the register of chancery of the county." The time to redeem expired August 1, 1952.

Plaintiff Harold Farr testified that instead of paying directly to Nordman or to the register in chancery (in this case the county clerk), on May 6, 1952, he went to the county treasurer's office to redeem the property for the 1947 taxes. He stated that he was told he would have to first redeem other taxes and paid the sum of $18.75, even though the notice he had required the payment of $35.04. He was given a redemption certificate showing the taxes for 1948 were redeemed. Plaintiff further testified that he thought he was paying the 1947 tax.

Defendant Nordman brought an ejectment action against plaintiffs, and plaintiffs thereupon filed this

suit to set aside the tax sale. The lower court dismissed plaintiffs' bill of complaint, and plaintiffs bring this appeal.

In deciding this case our consideration is first directed toward the fact that plaintiffs definitely had notice of the tax sale for the 1947 tax on February 1, 1952, and that this suit was not commenced until September 11, 1953, more than a year after such notice.

CL 1948, § 211.70 (Stat Ann 1950 Rev § 7.115) provides:

"That no sale shall be set aside after confirmation, except in cases where the taxes were paid, or the property was exempt from taxation. In such cases the owner of such lands may move the court at any time within 1 year after he shall have notice of such sale to set the same aside, and the court may so order upon such terms as may be just."

In *Odgers* v. *Lentz,* 319 Mich 502, the above-quoted statute was under consideration, and the Court in that case said (pp 506, 507):

"The Court held in *Hayward* v. *O'Connor,* 145 Mich 52, 55; and in *Shaaf* v. *O'Connor,* 146 Mich 504, 506 (117 Am St Rep 652):

" 'When the owner of land has notice—no matter how he obtains that notice—that his land has been sold for taxes, he must, if he desires to have the sale set aside by the circuit court, take proceedings within 1 year.'

"See, also, *Palmer* v. *State Land Office Board,* 304 Mich 628. As stated in *Pratt* v. *Corns,* 214 Mich 390, 395:

" 'One who has let his legal remedy be outlawed cannot obtain relief in equity. *Webster* v. *Gray,* 37 Mich 37. This doctrine has been frequently announced by this Court.' "

In view of what has been said, the other errors claimed by plaintiffs are not necessary to this de-

cision as their determination, one way or the other, could not alter the ultimate result. These issues primarily concern questions of fact in regard to the alleged $12 payment, the payment of taxes in May, 1952, by plaintiff Harold Farr, and that the $12 should have been accepted as a partial payment of the 1947 taxes. Suffice it to say that the lower court's conclusions in regard to these matters are adequately substantiated by the record.

We are not unmindful that plaintiffs stand to lose their home, and we have diligently sought, as did the lower court, to find a way to grant them the relief prayed for. However, in view of the decision in *Odgers* v. *Lentz, supra,* such relief must be denied.

Decree of the lower court dismissing the bill of complaint is affirmed. No costs, a public question being involved.

DETHMERS, C. J., and SHARPE, BOYLES, and CARR, JJ., concurred with KELLY, J.

BLACK, J. (*dissenting*). This suit, brought here in abortive effort to save that which judging by tax assessments must be a home of the humble, will undoubtedly be known in years to come as the "thirty-six cent tax case." It arrives in a court of equity grown cold and aloof from the warmth and worth of its maxims—a court that, to engage Mr. Justice Cardozo's expression, plunges the knife with averted gaze, convinced as it deplores and performs the sacrificial rite that it has no other choice—a court that wrings pious hands as it records upon corporal oath inability "to find a way to grant them (the plaintiff home-losers) the relief prayed for."

"The Accusing Spirit, which flew up to heaven's chancery with the oath, blushed as he gave it in;— and the Recording Angel, as he wrote it down,

dropped a tear upon the word, and blotted it out for ever."*

The dignity of high office restrains a more vigorous preamble. As I behold, on this record of oppression, victory in this "court of equity" of the oppressor over the oppressed, the sayings of John Morley stand forth. The first characteristic of the righteous is active opposition to injustice. The instinct to become indignant in the face of tyranny is a divine impulse. It is a serious mistake to assume that the true Christian never becomes angry.

Mr. Justice SMITH writes that the presently-considered platted lots could not lawfully be sold at tax sale for the assessed taxes combined with the penalty. He says that the presently-mentioned $12 when received by the treasurer actually operated to pay the outstanding taxes—not penalty—against both lots. I agree with his conclusion but nevertheless prefer direct stand upon equities the force and appeal of which should be sufficient to save the home lot at very least. ·

The facts of the case alone are provocative, to say nothing of majority conclusion thereon. They will now unfold.

A home, situated on 1 of the 2 mentioned lots, is separately assessed for taxes in the sum of $10. An adjacent vacant lot, belonging to the same home-owners, is separately assessed in the sum of $2. The last date for paying such taxes, without penalty, is January 10th of the year succeeding assessment. The mentioned owners fail to pay both assessments by January 10th. Between that date and the time of tax settlement in early March the tax collector (township treasurer) is authorized by law to collect a penalty on each such delinquent tax. The col-

---

* Life and Opinions of Tristram Shandy, by Laurence Sterne, p 342.

lector's demanded penalty on the home lot was 30 cents and on the adjacent lot it was 6 cents.

Prior to tax settlement the mentioned owners of the 2 lots sent the township treasurer $12 for the known purpose of paying such taxes. No portion of the amount so forwarded was ever credited to payment of taxes on either lot and, on face of the testimony and accompanying instruments brought here, the $12 has disappeared. The township treasurer says she sent the $12 back to the mentioned homeowners because it was 36 cents short. The homeowners say they never received it.

On strength of this impasse it is said that the home was lost by force of the ensuing delinquent tax sale proceedings—that title thereto has irrevocably passed to the grasping tax sale bidder—that it cannot now be redeemed by force of law—and that this Court of equity is powerless to hear and determine the equities of the presented case because a statute* distinguished from equity's maxims says this bill entered the county clerk's office 7 months and 10 days too late. Such is the puerile challenge to which this "court of equity" yields in supine shame.

*First:* The need for attention in these chambers to Michigan's visible drift during recent years from the principles of equity in equity cases recalls Professor Pomeroy's warning, voiced exactly 75 years ago. It appears in the preface to each edition of his master treatise on equity jurisprudence. I quote it from the latest (1 Pomeroy's Equity Jurisprudence [5th ed], pp xxiv, xxv) as follows:

"There has not, of course, been any conscious intentional abrogation or rejection of equity on the part of the courts. The tendency, however, has plainly and steadily been towards the giving an un-

---

* CL 1948, § 211.70 (Stat Ann 1950 Rev § 7.115). This is section 70 of the general property tax law.

due prominence and superiority to purely legal rules, and the ignoring, forgetting, or suppression of equitable notions. The correctness of this conclusion cannot be questioned nor doubted; the consenting testimony of able lawyers who have practiced under both systems corroborates it; and no one can study the current series of State reports without perceiving and acknowledging its truth. In short, the principles, doctrines, and rules of equity are certainly disappearing from the municipal law of a large number of the States, and this deterioration will go on until it is checked either by a legislative enactment, or by a general revival of the study of equity throughout the ranks of the legal profession. * * *

"I need not dwell upon the disastrous consequences of the tendency above described, if it should go on to its final stage. Even a partial loss of equity would be a fatal injury to the jurisprudence of a State. So far as equitable rules differ from those of the law, they are confessedly more just and righteous, and their disappearance would be a long step backward in the progress of civilization."

Chief Justice Cardozo's historic and oft-quoted dissent in *Graf* v. *Hope Building Corp.*, 254 NY 1 (171 NE 884, 70 ALR 984)* has become equity's modern fount in cases where the tyrant demands his dollars and cents on legal time whatever the impact of sickening hardship his victim suffers on account thereof. *Graf* is the case where a mortgagor's agent, about to leave

---

* Cited in *Addison* v. *Holly Hill Fruit Products,* 322 US 607, 620; (64 S Ct 1215, 88 L ed 1488, 153 ALR 1007), this way:

"The creative analogies of the law were drawn upon by which great equity judges, exercising imaginative resourcefulness, have always escaped the imprisonment of reason and fairness within mechanical concepts of the common law. See, *e. g., Atlantic Coast Line R. Co.* v. *Florida,* 295 US 301 (55 S Ct 713, 79 L ed 1451); *Inland Steel Co.* v. *United States,* 306 US 153 (59 S Ct 415, 83 L ed 557); and for some examples of this approach see *Graf* v. *Hope Building Corp.,* 254 NY 1, 7 (171 NE 884, 70 ALR 984) (Cardozo, C. J., dissenting)."

for Europe, left instructions with a bookkeeper to make timely payment of the mortgage-required instalment of principal and interest. Through an error of arithmetic the check, as timely mailed to the mortgagee, was short a comparatively trifling amount. The time for payment of the instalment having expired, and the mortgage containing an acceleration clause, the mortgagee demanded his full pound of accelerated payment. The chief justice said this for the minority of his day (pp 9, 12–14) :

"Equity follows the law, but not slavishly nor always. *Hedges* v. *Dixon County,* 150 US 182, 192 (14 S Ct 71, 37 L ed 1044). If it did, there could never be occasion for the enforcement of equitable doctrine. 13 Halsbury, Laws of England, p 68. * * *

"True, indeed, it is that accident and mistake will often be inadequate to supply a basis for the granting or withholding of equitable remedies where the consequences to be corrected might have been avoided if the victim of the misfortune had ordered his affairs with reasonable diligence. *United States* v. *Ames,* 99 US 35, 47 (25 L ed 295) ; *Grymes* v. *Sanders.* 93 US 55 (23 L ed 798) ; *Noyes* v. *Clark,* 7 Paige (NY) 179 (32 Am Dec 620). The restriction, however, is not obdurate, for always the gravity of the fault must be compared with the gravity of the hardship. *Noyes* v. *Anderson,* 124 NY 175 (26 NE 316, 21 Am St Rep 657) ; *Lawrence* v. *American National Bank,* 54 NY 432; *Ball* v. *Shepard,* 202 NY 247, 253 (95 NE 719). Let the hardship be strong enough and equity will find a way, though many a formula of inaction may seem to bar the path. *Griswold* v. *Hazard,* 141 US 260, 284 (11 S Ct 972, 999, 35 L ed 678). * * *

"In this case, the hardship is so flagrant, the misadventure so undoubted, the oppression so apparent, as to justify a holding that only through an acceptance of the tender will equity be done."

For the support of these great doctrines the present dissent is respectfully devoted. In accordance

therewith, and to consider this case, we who revere equity adjourn to the quiet and sacred portals of equity's cathedral. As we deliberate, our 10-commandment maxims supposedly attend each written and spoken word. The appealing tenets of conscience, guided by these maxims, lead us unerringly to every ruling and every decision made in the course of assembly here. The unaccompanying majority, however, says "We cannot find a way." The search wherever made must have been slight—the effort not prolonged.

*Second:* Today's majority gives us the following as essential facts of the case we have before us:

"In December, 1947, plaintiffs received notice that the tax due on the lots amounted to $12 and, in order to avoid a further penalty of 3%, should be paid on or before January 10, 1948. Plaintiff Evelyn Farr testified that she was unable to pay the tax before the due date, but that in March, 1948, she sent to Vera Shipman, Plainfield township treasurer, a $10 and two $1 bills, and that she was subsequently advised by Mrs. Shipman that the money had been sent to the courthouse. Mrs. Shipman denied receiving payment in the form of a $10 bill and two $1 bills, but said she did receive a money order for $12 which she returned to plaintiff because plaintiff had refused to pay the 3% penalty."

I add—that the picture be made whole—these possibly repetitious but detailed facts.

The home in question is situated on lot 21. Adjacent lot 20 is vacant. Lots 20 and 21 were separately assessed through the years and of course became subject to separate payment and separate redemption. The township treasurer's bill to the plaintiffs, for 1947 taxes, separated the assessments and tax totals as to each lot. The bill specified the total tax on lot 21 as $10 and the total tax on lot 20 as $2. The currency making up the $12, mentioned in Mr.

Justice Kelly's opinion, was according to plaintiff Evelyn Farr "put in an envelope and handed to the mailman"—the envelope being addressed to the township treasurer, Vera Shipman.

Mrs. Farr positively testified that the $12 was never received back from Mrs. Shipman, in the form of a money order or otherwise, and that Mrs. Shipman told her that she, Mrs. Shipman, "had mailed the tax money of $12 to the courthouse." Mrs. Farr testified further that Mr. Hunsberger, the township supervisor in whose home Mrs. Shipman lived during the collection months of January, February, and March of 1948, told her (Mrs. Farr) the 1947 taxes were paid. This latter testimony is neither disputed nor discredited.

The record additionally discloses that Mr. and Mrs. Farr were habitually delinquent in payment of their taxes. It discloses too that the defendant Nordman, doing what appears as a rousing good business in the acquisition of tax titles, was just as regularly buying up taxes on the Farr lots as such came to sale. The reason for this situation is disclosed this way in the testimony of Mrs. Farr:

"I have heard Mrs. Shipman testify what she said, and I say I sent $10 and $2. It is right that the taxes were more than $12. My husband was sick and my daughter gave me that money.

"*The Court:* It was only 36 cents more, and you were angry because they wanted to charge you that penalty.

"*A.* At that time I couldn't pay it.

"*The Court:* Thirty-six cents, and you have gotten into a lawsuit that may involve the loss of your home for 36 cents.

(Witness continuing):

"I didn't pay any attention to the cards or letters on the 1947 tax because I knew I had paid it. When she said I mailed her a money order, that is untrue."

Further, and with regard to Mr. Justice KELLY's reference to Nordman's talk by telephone with Mrs. Farr, we find this version of the affair as related by Mrs. Farr:

"I did not talk with Mr. Nordman before Jim Toohey served the notice on me. The only time I ever talked with Mr. Nordman was in 1952 when it was cold. I can't tell what month it was but they wore overcoats. There was a lady with Mr. Nordman but she wasn't in the house. I talked with him on that occasion and he told me I would have to pledge the money before I got the place back. I said we won't, and the tax is paid. My tax was paid; and he said 'Give me the receipts.' He did not give me any authority for demanding to see my receipts and I told him I would look for it. I did look for it but did not find it because I didn't receive any receipt back but I can truthfully prove I sent the $12 to Mrs. Shipman.

"*The Court:* Did she tell you how much the tax was with interest?

"*A.* She did.

"*The Court:* How much did she tell you?

"*A.* She said it was $12, 36 or 38 cents. I wouldn't recall right to the penny.

"*The Court:* And you told her you wouldn't pay more than 12.

"*A.* I told her I couldn't. I didn't have a penny in the house. I only had the $12. My daughter gave it to me to pay for it, but I did have a self-addressed envelope, and I sent it to Mrs. Shipman, and I waited 4 days and called her and asked her if she would please send my tax receipt. She said she had sent that money to the county treasurer, and I called them also to send me a tax receipt."

So much for the facts and the unusual supplication thereof. It is easier indeed to follow the beaten path than it is to clear another.

*Third:* Our majority in this year 1956 says it cannot find a way to save this home. I say we can and that we should rest decision on the rule of *Palmer* v. *State Land Office Board,* 304 Mich 628. Here as there a good-faith effort to pay delinquent taxes was made. Here, unlike *Palmer,* actual payment of more than enough to pay the tax and penalty on the principal parcel delinquent was made within the proper time to the proper official. That effort failed at law through mistake or fault of such official. It should prevail of right in equity.

The ultimate fact of this case is that the township treasurer duly received more than enough money from the plaintiffs to pay the outstanding tax plus penalty on their home lot. Whether the township treasurer sent the money to the county treasurer, or whether she mailed it back to the plaintiffs, is of little concern in equity. Considering the probably unprecedented equities of the case before us, and limiting ensuing observation thereto, I hold that the $12 should on receipt have been applied, with or without direction from plaintiffs and to fullest extent, to the known purpose of its forwarding.

They (the plaintiffs) say positively they did not receive the $12 back from the township treasurer. The latter says she sent it back. The money (or money order if there was one) went somewhere, that we know. Its last for-sure possessor was the township treasurer. The supervisor (Mr. Hunsburger) indisputably assured plaintiff Evelyn Farr that "the 1947 tax was paid" and *Palmer* says she had a right to rely on his statement. In these circumstances we as chancellors of the court of chancery admit to disgusting impotence through failure to apply equity's first and foremost maxim—equity regards and treats as done that which in good conscience should have been done.

Pomeroy says (2 Pomeroy's Equity Jurisprudence [5th ed], § 364, pp 10–12):

"Some writers have failed to apprehend the full significance of this maxim, and have described its effects in altogether a too narrow and partial manner. Others have correctly looked upon it as the very foundation of all distinctively equitable property rights, of all equitable estates and interests, both real and personal. * * * So far from the maxim being confined to express executory contracts, and to those dispositions of property which give rise to an equitable conversion, it has been applied by the most eminent courts to all classes of equities; to every instance where an equitable *ought* with respect to the subject-matter rests upon one person towards another; to every kind of case where an affirmative equitable duty to do some positive act devolves upon one party, and a corresponding equitable right is held by another party."

*Fourth:* It is said that the 1-year period of limitation prescribed in aforesaid section 70 of the general property tax law expired with binding finality between service of notice (February 1, 1952) and filing of bill (September 11, 1953). *Odgers* v. *Lentz,* 319 Mich 502, is advanced in support. *Odgers* presents no unusual equities and it came here with restricted question presented on a stipulation of counsel. No claim of actual payment or actual tender was made. Yet our majority accepts and applies it here as a deplored bar to equity's grace.

Equity is not troubled or impeded by limitations at law where actual or constructive fraud is involved or equities are sufficiently compelling. These plaintiffs in equity's view paid in good time more than enough to retire this delinquent tax on their home. Mr. Nordman has invested nothing, over and above his paltry bid of $13.24, in that home. Immediately upon expiration of section 70's 1-year period of lim-

itation. he wrote plaintiffs his ultimatum to commence paying rent at $22 per month or suffer ejectment. Shortly thereafter he commenced such threatened action and plaintiffs in turn filed this bill.

The facts alone, if not proof of constructive fraud, are sufficient to meet and annihilate claim that the guillotine of limitation dropped with killing finality less than 8 months prior to filing of the present bill. Laches, not limitation by statute, is the controlling rule of conduct on this side of the Court, and our decisions set at rest any question that a statute of limitation must always be accepted and applied in equity regardless of equity.

*Brown* v. *Harrison,* 242 Mich 603, 606: "Defendants' counsel insisted in the court below and do here that the laches of plaintiffs precludes recovery here. It is a general rule that a court of equity will apply the statute of limitations by analogy. But this is not a hard and fast rule. The court of equity frequently overlooks delays."

*Brydges* v. *Emmendorfer,* 311 Mich 274, 279: "We are not in accord with defendants' claim that the trustee is barred by laches or statute of limitations from maintaining the suit. The statute of limitations does not control the question of laches in equitable actions."

*Tilley* v. *Brady,* 323 Mich 547, 551: "The suit being in equity, the statute of limitations has no direct application. The question, therefore, is whether it appears from the bill that plaintiff has been guilty of laches barring her right to seek relief in equity. In considering such question it must be borne in mind that lapse of time alone is not sufficient to constitute laches. There must also be a change of conditions rendering it inequitable to enforce the claim, or such a showing as establishes that the defendants were prejudiced by the delay. Each case must be determined on its own facts. *Sanders* v. *Campbell,* 231 Mich 592; *Collins* v. *LaMotte,* 244 Mich 504; *Hope* v.

*Detroit Trust Co.,* 275 Mich 213; *Brydges* v. *Emmendorfer,* 311 Mich 274. It does not appear that defendants were prejudiced in any way because of plaintiff's failure to press her alleged cause of action more promptly. Neither does it appear that there was any such change in circumstances as would have rendered it inequitable to permit her to do so at the time she brought the present action."

*Fifth:* I already hear querulous plaint that questions dealt with in this opinion have not been raised in court below or brief on appeal. The short answer is that we hear and consider equity cases *de novo*— that we stand in the same position of maxim-guided duty as did the chancellor of the circuit court. Here, as in that court, the responsibility of equity is neither controlled nor limited by the action or inaction of counsel. Equity delights in doing justice, and not by halves. She is ever vigilant to guard the weak and the ignorant, the meek and the misinformed, from the evils of injustice whenever and wherever the equities of the whole unfolding matter sufficiently appeal to the mighty compassion of her benevolent instruments. Tyranny amounting to legal butchery, occurring in her very presence, is a challenge she rarely fails to meet whether she be petitioned to action or moves of her own will.

To recapitulate: This in sum is an obvious case of ignorant and impecunious folk clinging tenaciously and regardless of a tax-sale notice to understandable conviction that their taxes have been paid—to childlike faith that they, hence, need fear no evil. As Mr. Justice Cardozo would say, their hardship is so flagrant, their misadventure so undoubted, the result so apparent, that equity's will may be done only through equitable relief from the forfeiture decreed below.

I would forcibly inject this steady acquirer of Farr-home tax titles with equity's beneficent religion

by imputing to him the purposes of a volunteering trustee—a trustee whose noble act of stepping forth to the auction block, with a bid of 14 whole dollars* for this home, was motivated solely by intent to protect from the jaws of tax sharks those whose witless faith in the previous tender or payment of $12 has left them exposed in dangerously infested legal waters. Such a decree would afford wholesome teaching that homes are not always safely bought at tax sales for the cost of a short grocery order. The injection would, at the same time, permit in our quarters an enthusiastic vote of approval of a decreed and fully executed trusteeship.

I would reverse for decree of redemption as to lot 21. The decree should, of course, assure Mr. Nordman prompt refund of his out-of-pocket investment in lot 21 plus interest thereon. For evident reasons I would deny costs all around.

SMITH, J. (*dissenting*). We have here no minor tragedy. A family is losing its home. The sovereign power is exercising a doctrine abhorred by equity, that of forfeiture. We speak not in condemnation. The statutes so permit. Possibly there is no other recourse available. That is not for our consideration. But we do have for consideration the validity of its exercise. When an officer of the government, as here, a stranger to the title, undertakes to sell that which he owns not, we scrutinize his acts with a jealous eye. He has no rights except those vested in him by scrupulous adherence to statute made and provided. We are keenly aware of the inviolability of private property, the sacred attributes of the homestead, protected by the genius of the common law and the letter and spirit of our Constitutions. We are

---

* Mr. Nordman's successful bid for lot 21 at the tax sale was $13.24. His bid for lot 20 (the vacant lot) at same sale was $3.45.

equally aware of the demands of our sovereign people that the tide of the tax moneys flow on and still on, unhaltingly and undiminished, that the powers of the government not waste or falter through the machinations of the wicked, or the wiles of the adroit. The statute, then, will be enforced to the letter. But it must be to the letter. Every "i" must be dotted and every "t" crossed. A sale founded on forfeiture receives no indulgence from a court of equity, tax moneys or no.

It is clear from the most rudimentary considerations that a taxpayer who has, in good faith, twice attempted to pay his taxes will not be permitted by the chancellor to lose his home for the nonpayment of these very taxes. True, his attempted payment was refused, both by the township treasurer, and, later, "down to the Court House" where he went to the wrong official to redeem. But the attempts should not be ignored by us, cannot be, in fact, if we are to do equity. With my Brother BLACK's trenchant observations respecting the regrettable atrophy of equity I am in full accord. My own views on the subject will be found in another tax case, written contemporaneously herewith, *Consumers Power Co.* v. *County of Muskegon, ante,* 243. I agree with my distinguished Brother that upon the facts before us the sale was without warrant. Possibly, since we are in substantial agreement as to result, I might well cherish my views in silence. But the opposing view, that of the court below and that of Mr. Justice KELLY, that there is no way to grant these homeowners the relief prayed, betrays a misconception of the nature of taxes and penalties unjustified in our law and which, I fear, may sire additional misshapen progeny unless restrained.

The controversy in this case concerns a charge of $12, described as the "1947 taxes" (exhibit 8), and

an additional charge which, under the statutes, could be collected "upon all taxes paid on or after said 10th day of January" (CL 1948, § 211.44 [Stat Ann 1950 Rev § 7.87]), here amounting to 36 cents. This additional sum required if payment is not made until after a certain date is accurately described by the trial court as a "penalty."

What is the nature of the additional charge imposed for delinquent payment of taxes? Does it become a part of "the" tax imposed, so that the tax becomes (in our case) the indivisible sum of $12.36, which can be liquidated only by the payment of $12.36?

Clearly not. However the delinquency charge is denominated (interest, penalty, charge, or what not), it remains separable in theory and amount, although statutes (see CL 1948, §§ 211.40, 211.60 [Stat Ann 1950 Rev §§ 7.81, 7.104]) commonly permit the tax remedies (*i. e.,* lien, sale) to be employed in its collection. Thus the Oregon court, in *Livesay* v. *De-Armond,* 131 Or 563, 569 (284 P 166, 68 ALR 422), analyzed the situation in these terms:

"It seems desirable to notice the distinction between a tax and any sums exacted by law for the failure to promptly pay it. Such exactions are often termed interest, yet the reasons which support them are unlike those upon which interest charges are founded. In the absence of some unusual provision in the statute authorizing the levying of a tax it is generally held that a tax is not a debt. * * * Therefore, an unpaid tax draws no interest unless legislation expressly directs a different result. * * * From *Colby* v. *City of Medford,* 85 Or 485, 527, 528 (167 P 487), we quote:

" 'In passing, it may be noted that when interest is charged on a delinquent tax it is not regarded as interest in the sense that it is a consideration for the forbearance of money, but it is deemed

to be a penalty; and when interest, so called, is charged, it is sustained on the theory that it is a means to insure prompt payment of the tax and it is not a part of the tax. *State* v. *Superior Court,* 93 Wash 433 (161 P 77).' "

Likewise the Missouri court in *State, ex rel. Crutcher,* v. *Koeln,* 332 Mo 1229, 1237 (61 SW2d 750):

"With regard to what may be called the interest penalty this court *en banc,* in *Seaboard National Bank* v. *Woeston,* 176 Mo 49, 62 (75 SW 464), held, that the statute (now section 9941) does not change the character of the imposition; that it is not an 'additional tax' at all, for regarded as a tax it would or possibly might be illegal, as the amount of the taxes that the constitution permitted had already been levied; and that it is not 'interest' in any proper sense, because it is a penalty imposed for a failure to discharge a duty that can be lawfully demanded. * * * And the same rule applies to other burdens imposed by statute for the nonpayment of delinquent taxes, which being in the nature of penalties (citations omitted) clearly come within the broad scope of the word 'penalties'."

The holding of the Washington court in *Henry* v. *McKay,* 164 Wash 526, 533 (3 P2d 145, 77 ALR 1025) is in accord:

"The provision exacting payment of interest for delinquency in the payment of taxes does not make the interest a part of the tax, but pertains to the remedy employed to compel payment of the tax when due. The legislative power to exact from a property-owner interest for delay in discharging his obligation is upheld upon the ground—a proposition which needs no citation of sustaining authority—that the sovereign, the State, has the authority to tax the property."

· Similarly, the Montana court in *State, ex rel. Sparling,* v. *Hitsman,* 99 Mont 521, 527–529 (44 P2d 747):

"It then becomes important to consider and decide whether the statutory penalties and interest imposed on a delinquent taxpayer by the laws of this State are to be considered as a part of the tax itself. The cases of *Sanderson* v. *Bateman,* 78 Mont 235 (253 P 1100), and *State, ex rel. Kain,* v. *Fischl,* 94 Mont 92 (20 P2d 1057), held that the penalties and interest were a part of the tax obligation. With that theory we do not now agree. \* \* \*

"Having decided that interest charged against delinquent taxes is in fact a part of the penalty, we then proceed to the question of the nature of such a penalty. This court has defined 'penalty' as follows: 'A penalty is a sum of money which the law exacts the payment of by way of punishment for doing some act which is prohibited, or the omission to do some act which is required to be done.' \* \* \* Can the penalty be considered as a part of the tax obligation? \* \* \*

"We find ourselves in agreement with the principle announced by the California court in the late case of *Islais Co.* v. *Matheson* (Cal App), 35 P2d 1051, 1054. There it was said: 'The imposition of the original severe penalties was simply an incident of the power of sovereignty. In the exercise of the taxing power the imposition of a penalty is not for the purpose of enhancing the State but for punishing the taxpayer for nonpayment \* \* \* and the threat of such penalty is used as a means of inducing property owners to promptly pay the amount due. \* \* \* A penalty is not part of a tax proper and is therefore subject to legislative control.' "

It thus seems clear that a distinction is necessarily drawn between (a) the tax itself and (b) additional charges to which the taxpayer will subject himself for nonpayment of (a). These latter charges are

not levied or assessed with the taxes upon the property, and their inclusion as a "tax" might conceivably raise difficult questions with respect to constitutional limitations upon taxes that may be levied and collected, as was pointed out in *State, ex rel. Crutcher, v. Koeln, supra.* Such sums are, in fact, not a tax in any proper sense, but an additional charge imposed by the sovereign because of the delinquency. As such it is a separable liability, though enforced by lien.

With respect to such separable liability, may the taxpayer pay only the tax and not the penalty? A caveat would seem in order, for confusion should not be permitted to arise at this point. If, for some reason, a taxpayer chooses, or elects, or can afford, only to pay the tax, it would seem obvious that he continues liable for any sums properly charged, remaining unpaid. This liability may be enforced in accordance with statutory procedure. But enforcement, in such case, is only for the sum due and unpaid, not (in this case) for gross sum of taxes and penalties. The difference between the 2 sums will normally be substantial and a far lesser amount will be required for redemption if there has been non-payment only of the penalty.

As to the question posed, then, whether the taxpayer may pay only the tax, and not the penalty, we are cited to no section of the statute forbidding the acceptance of such payment, and in view of the need for tax revenues we are not disposed to imply that a tax tendered in full shall not be so received. Powerful analogy is found in the statutes of this State (which are common in the country) to the effect that the taxpayer may pay 1 of several taxes assessed against his land in any 1 year without paying the other tax items that make up his total liability for that tax year.

"Any person may pay the taxes or special assessments, or any 1 of the several taxes or special assessments, on any parcel or description of land, or on any undivided share thereof, and the treasurer shall note across the face of the receipt in ink any portion of the taxes or special assessments remaining unpaid." CL 1948, § 211.53 (Stat Ann 1950 Rev § 7.97).

It has been an uncontroverted rule of the law of taxation throughout the United States that a taxpayer may pay any 1 of several tax items for which he is liable to the State, as long as he pays each in full.  See the cases collected in 89 ALR 715.  In Michigan, the right is also recognized and enforced in favor of the taxpayer. *Chapin Mining Co.* v. *Uddenberg,* 126 Mich 375.  In further support of this proposition, see the more recent cases of *Loew's, Incorporated,* v. *Byram,* 11 Cal2d 746 (82 P2d 1); *Moore* v. *Missouri State Life Insurance Co.,* 43 Ariz 337 (31 P2d 99); *Tondre* v. *Garcia,* 45 NM 433 (116 P2d 584); *Federal Land Bank of St. Paul* v. *Johnson,* 67 ND 534 (274 NW 668).

Returning to the facts before us:  It is conceded that there was due at the time that the plaintiffs forwarded the $12 to the township treasurer a total of $12.36—consisting of $12 in taxes upon the 2 lots and 36 cents in penalties upon this amount. There is no denial that the township treasurer received the $12 from the plaintiffs with a direction that it be applied to the taxes as due before the addition of the penalties.  The township treasurer testified as follows:

"I told her it would have to be whatever the figures were, and she said she wouldn't pay that amount. She would pay what it was at first and I would have to take it.  *  *  *  So a couple of days after, I got a money order for the lesser amount and I mailed it back to her."

The township treasurer was here in error. The $12 tendered should have been applied in payment of the $12 tax liability, as directed by the taxpayer. The treasurer's error will not serve to deprive the taxpayer of his homestead. The law on this point is clear, and is well expressed in 84 CJS, Taxation, § 618, p 1237:

"A good and sufficient tender of taxes due has the same effect as actual payment, in preventing the lawful prosecution of any proceedings for the enforcement of the taxes, provided the tender is kept good."

There is no need to burden this opinion with the multitude of cases supporting the text. They will be found in the treatise cited. A sale of land for taxes so tendered is without color of authority and void. Nor is the doctrine limited to a strict tender in the legal sense. Few laymen are equipped to undertake literal compliance, but all must pay taxes. Hence, the common holding that it is enough that the taxpayer make merely a good-faith application to pay the taxes to the proper officer. If such payment is prevented by the officer's mistake or fault (as here) we have the equivalent of actual payment. It was Mr. Justice BOYLES of this Court who held, over a decade ago, in accordance with well-settled authority, that "A good-faith attempt by the landowner to pay his taxes is equivalent to payment." *Palmer* v. *State Land Office Board,* 304 Mich 628, 633.

There having been the equivalent of payment, the sale as made was entirely without statutory warrant. 3 Cooley, Taxation (4th ed 1924), § 1382, contains a concise and accurate statement of the principles involved:

"Tax sales are made exclusively under a statutory power. The power which the State confers to assess

and levy taxes does not of itself include a power to sell lands in enforcing collection, but the power to sell must be expressly given. The officer who makes the sale sells something he does not own, and which he can have no authority to sell except as he is made the agent of the law for the purpose. But he is made such agent only by certain steps which are to precede his action, and which, under the law, are conditions to his authority. If these fail the power is never created. If one of them fails it is as fatal as if all failed. Defects in the conditions to a statutory authority cannot be aided by the courts; if they have not been observed the courts cannot dispense with them, and thus bring into existence a power which the statute only permits when the conditions have been fully complied with."

In accordance therewith, we have held since the earliest times. It was in *Rowland* v. *Doty,* Harr Ch (Mich) 3, 9, that we said:

"The right to sell, being founded solely on the non-payment of the tax, does not and cannot exist whenever the tax has been paid. A sale, therefore, when no tax is in fact due, is unauthorized, and the treasurer's deed on such unauthorized sale conveys no estate or title whatever."

And for modern exposition of the principle see *Mc-Quade* v. *State, ex rel. State Land Office Board,* 321 Mich 235, 247, where it was held, in setting aside a scavenger sale, that:

"The legislature has outlined, in clear and unmistakable terms, the duties of public officials in connection with tax sales. The exercise of power or authority not authorized by the statute may not be passed over as merely irregular. The conclusion follows that the sale of the property involved in the present case was void."

The case of *Odgers* v. *Lentz,* 319 Mich 502, discussing CL 1948, § 211.70 (Stat Ann 1950 Rev § 7.115),

has no application upon these facts. The purported "sale" in the case before us was illegal and void. As we said in *McQuade* v. *State, ex rel. State Land Office Board, supra* (p 244):

"However, failure to file objections within the specified period after the sale does not preclude an attack thereon, if such sale is void because of a want of jurisdiction to make it. This Court in *Horton* v. *Salling,* 155 Mich 502, held that a deed of State tax land was void because the auditor general accepted interest on the State's claim for taxes at a rate lower than that prescribed by the statute. In support of its conclusions, *Horton* v. *Helmholtz,* 149 Mich 227, was cited. In holding that plaintiff was not precluded under the provisions of section 70 of the general property tax law from seeking a decree in equity to quiet his title to the property there in question, it was said (p 505):

" 'The provision quoted from section 70 was designed to confer and limit, in tax cases, the general discretionary power, lodged in courts of equity to set aside sales, made in the same proceeding, for an inadequate price bid, or because of irregularities, and was not aimed at the authority of courts in general to hear and determine the validity of decrees and sales. This subject was discussed in the case of *Spaulding* v. *O'Connor,* 119 Mich 45. This sale being absolutely void, complainant might treat it so, and raise the question in ejectment (in a proper case) or by this proceeding.' "

The decree of the circuit court should be reversed and the case remanded for entry of decree not inconsistent herewith, with provision for refund of investment in the property by defendants, or any of them, together with interest thereon. No costs.

EDWARDS, J., took no part in the decision of this case.