SPOON-SHACKET COMPANY, INC., *v.* COUNTY OF OAKLAND.

1. Equity—Unjust Enrichment—Mistake.
   Equity should intervene whenever it is made to appear that one party, public or private, seeks unjustly to enrich himself at the expense of another on account of his own mistake and the other's want of immediate litigatory vigilance.

2. Same—Common Law—Justice.
   It is the peculiar duty of a court of equity to supply the defects of the common law, correct its rigor or injustice and enforce every natural duty that is not provided for at common law, all pursuant to the settled principles of equity and by acting upon the parties personally.

3. Same—Precedents—Change of Circumstances.
   The application of equitable principles, illustrated but not restricted by precedents, is nevertheless adaptable to new circumstances as presented so as to meet the wants of a progressive civilization.

4. Same—Mistake—Constructive Fraud.
   Equity will grant relief where mistake is of such a nature as to constitute constructive fraud.

5. Statutes—Retroactive Effect.
   A legislative enactment will not be presumed as having retroactive effect.

6. Taxation—Mistake—Declaration of Rights—Recovery of Overpayment.
   A taxpayer has a right to be considered as entitled to recover the amount of mistakenly or inadvertently levied and uncon-

References for Points in Headnotes

[1, 4] 19 Am Jur, Equity § 49 *et seq.*
[2] 19 Am Jur, Equity § 3.
[3] 19 Am Jur, Equity § 448.
[5] 50 Am Jur, Statutes § 478.
[6] 51 Am Jur, Taxation § 1183.

scionably collected property taxes in the absence of valid statu-
tory prohibition from doing so, on bill for declaration of
rights as to taxes on vacant, unimproved property that was
assessed for the year for over 10 times more than in the
following year, *Consumers Power Company* v. *County of Mus-
kegon,* 346 Mich 243, being overruled in such respect; not-
withstanding no relief had been sought before board of
review (CL 1948, § 691.501 *et seq.*).

7. Costs—Declaration of Rights—Assessment for Taxes—Mis-
take.

No costs are allowed in suit for declaration of rights as to
claimed mistake in assessment of property taxes (CL 1948,
§ 691.501 *et seq.*).

Dethmers, C. J., and Carr and Kelly, JJ., dissenting.

Appeal from Oakland; Adams (Clark J.), J. Sub-
mitted January 9, 1959. (Docket No. 42, Calendar
No. 47,703.) Decided June 5, 1959.

Bill by Spoon-Shacket Company, Inc., a Michigan
corporation, and Ira J. Spoon against the County of
Oakland, the City of Madison Heights and District
No. 4 Lamphere Public School of the Cities of Madi-
son Heights and Troy, municipal corporations, for
declaration of rights as to erroneous assessment and
tax levy. Bill dismissed. Plaintiffs appeal. Re-
versed and remanded.

*Anbender & Anbender (Lionel E. Spoon,* of coun-
sel), for plaintiffs.

*H. Eugene Field,* for defendant City of Madison
Heights.

*Charles A. Davis* and *Robert P. Allan,* Assistant
Corporation Counsel for *Harry J. Merritt,* deceased,
Corporation Counsel, for defendant County of Oak-
land.

*James G. Hartrick,* for District No. 4 Lamphere
Public School.

BLACK, J.   That the profession may properly be informed with respect to the unusual nature of this case and the self-reversible result I would reach, the opinion of the presiding chancellor is quoted in continuing part as follows:

"The plaintiff, Spoon-Shacket Company, Inc., a Michigan corporation, is the owner of lots 65 through 83, inclusive, and outlot A of Spoon-Shacket Subdivision, city of Madison Heights, Oakland county, Michigan.   Except for outlot A, those lots were assessed by the township of Royal Oak for tax purposes in the year 1955 at valuations, ranging from $150 to $400.

"In 1955 a number of homes were built in the subdivision, and in preparing the tax rolls the new homes were assessed by the new city of Madison Heights at a more or less uniform valuation of $5,500 each. Through inadvertence or mistake the assessing officer did not discover that lots 65–83, inclusive, had remained vacant and they too, were assessed at $5,500 each for tax purposes.

"The error in assessment was discovered by the city in 1956 and the assessment for the year 1957 on these lots reverted back to an amount approximately twice the 1955 valuations, but less than 1/10 of the valuations for 1956.

"Although plaintiff must be charged with constructive knowledge of the existence and amount of the 1956 assessment, it did not receive a tax statement from the new city in that year and hence did not have actual knowledge of the excessive assessment until April, 1957, when it attempted to pay the tax on 1 of the lots.   It then offered to pay the tax to the county treasurer under protest but that offer was refused.   Obviously and it is conceded, the plaintiff neither appeared before the board of review nor made prior inquiry at the city offices in regard to the assessment.   As a result of the assessing officer's mistake for 1956, plaintiff's tax liability for that year was more than 10 times greater than in the following year of 1957.

"Within less than 2 months after its actual knowledge of the assessments, plaintiff brought this action in chancery for a declaration of rights* alleging an existing controversy between the parties, asking that for the purpose of determining the parties' rights the tax for 1956 be considered as paid under protest, and praying for a decree determining the assessments to be excessive, invalid and illegal, and for other related relief.

"It should be here noted that the plaintiff seeks the same decree in relation to outlot A as asked in respect to the other vacant lots. The assessed valuation of that lot was $7,500 in 1955; $15,000 in 1956, and $19,000 in 1957. The progressive increase in valuation during the 3 periods was consistent with other assessments in the area, and the court is convinced, and so finds, that the assessing officer committed no error of omission or commission in connection with the assessment of this well-located property. Plaintiff itself is, at best, half-hearted in its concern over the assessment on outlot A, and this court finds no cause for complaint as to that assessment.

"In contrast it is apparent from the record that the assessing officer did make a significant mistake in the assessment of plaintiff's remaining property for the levy of 1956 taxes, a mistake of such significance as to constitute in the opinion of this court, a constructive fraud. The assessing officer is now deceased and it is suggested by the testimony that he did not view the property at the time he fixed the assessment. On the other hand it is conceivable that he may have visited the property but was confused as to lot numbers. Whatever the fact, there can be no doubt that a mistake was made which resulted in the plaintiff being charged some 10 times the tax levied on comparable property in the area. The defendants will benefit measurably from that mistake. Obviously this chancery court should not

* See CL 1948, § 691.501 et seq. (Stat Ann § 27.501 et seq.).—REPORTER.

permit the fruition of this injustice if it has the right to intercede.

"The situation herein presented parallels the problem discussed in the recent case of *Consumers Power Company* v. *County of Muskegon*, 346 Mich 243. The plaintiff in this cause would have the court rely upon the well reasoned dissent of Justice Smith in that case. In his dissent the Justice, citing the common law and decisions from other States, rebels against the existence of a double standard of morality as between individuals and municipalities. It is his conclusion that under established precedents in this State the chancery courts will not permit an individual to benefit to the detriment of another through a mutual mistake, but that, at least in the field of taxation, a municipality may do so if the error is not timely discovered. His summation (pp 265, 266) is worth repeating.

" 'This is the Supreme Court of Michigan speaking, the possessor of all the historic powers of law and equity, the keeper of the conscience of our sovereign people, a constitutional court of plenary powers, not a legislative court of enfeebled and circumscribed jurisdiction. What we are faced with is a simple case of constructive fraud. If, in such a case this Court must stand by with eyes downcast, protesting our impotence as we explain to this victim that we cannot "exercise legislative prerogatives," then the arm of justice has indeed withered and its conscience shriveled. Our constitutional duties may not be thus easily abandoned. Retreat before fraud, actual or constructive, carries us down a path forbidden to our feet. Under the clearest principles of good conscience and fair dealing this plaintiff should have restitution as prayed.'

"This court believes that Justice Smith's reasoning is sound, but, be that as it may, the doctrine of *stare decisis* must prevail in the trial courts of this State. The majority of Justices in the cited case ruled against the conclusion of the dissenting Justice, and unless and until the majority of that Court comes

to a different conclusion, this court finds itself constrained to follow the prevailing rule."

Having signed Mr. Justice Smith's dissenting opinion of *Consumers Power Company* v. *County of Muskegon,* 346 Mich 243, 251, I would apply—as would the chancellor had he been able—the reasoning of that opinion to this essentially duplicating case. The controlling declaration, written by Mr. Justice Smith in *Consumers,* is that equity can and should intervene whenever it is made to appear that one party, public or private, seeks unjustly to enrich himself at the expense of another on account of his own mistake and the other's want of immediate vigilance—litigatory or otherwise. That declaration, so written, has become our most constantly gnawed bone of contention as it recurrently passes from place to place around our solemn conference table. Starting with the notorious "thirty-six-cent tax case" (*Farr* v. *Nordman,* 346 Mich 266)*—in which 5 then members of this Court proclaimed (p 270) that they had "diligently sought, as did the lower court, to find a way to grant them (the appealing plaintiffs) the relief prayed for," and yet declared themselves hamstrung by the rigors of the law—and proceeding on through the recent case of *Romatz* v. *Romatz,* 355 Mich 81—where a new majority seated here vigorously cast aside (p 84) "the false premise that equity must find her jurisdiction * * * in legislative enactments granting direct and specific authority,"—this disputatious debate has continued since submission of the case at bar and, doubtless, will endure until the light of greater experience and deeper study —of equity's creative purposes—fully penetrates the slowly disappearing thought-shadows of our claustral quarters.

---

* See review of this case in 43 Cornell LQ, p 123.

In essence it is the so-called Blackstonian theory, that equity must subordinate herself to law, that divides us. Mr. Justice KELLY, relying on Blackstone by quotation from Judge Story's work on Equity Jurisprudence (Vol 1 [14th ed], § 15, p 16), happily makes this clear.† Blackstone's steadfast view (taken from Mr. Justice KELLY's quotation) was this: "By equity we mean nothing but the sound interpretation of the law." But Story certainly did not support Blackstone, as we shall presently see. Neither did Pomeroy, as we shall likewise perceive. The fact is that Blackstone's "Commentaries on the Laws of England" were written and published (1765–1768), and Blackstone died (1780), before the valued lessons of mature experience in equity's limitless field were fully learned, and it was a full century later that parliament adopted its equity-guarding amendment of the English judicature act of 1873.* The amendment came about this way:

"While the supreme court of judicature act was pending before the British parliament, there appeared in the Saturday Review a series of articles written by one of the ablest lawyers and most profound thinkers of the English bar, which pointed out a grave danger threatening the jurisprudence of England in the plan, as then proposed, for combining legal and equitable rights and remedies in the same action and administering them by the same tribunal. The writer showed, as the inevitable result of the system, that equitable principles and doctrines would gradually be suppressed and disappear in the administration of justice; that they would gradually be dis-

† Since this opinion was written Mr. Justice KELLY has deleted, from his opinion, his original quotations from Story and Pomeroy.

* 36 & 37 Vict, ch 66, and 38 & 39 Vict, ch 77. See the superb analysis of this act by the Honorable Willis B. Perkins, late of the 17th judicial circuit of Michigan, in 12 Mich L Rev 277. For the present phrasing of the amendment providing that "the rules· of ·equity shall prevail," see 18 Halsbury's Statutes of England [2d ed, Burrows], p 481.

placed and supplanted by the more inflexible and arbitrary rules of the law; until in time equity would practically cease to be a distinctive branch of the national jurisprudence. The reasoning of these remarkable articles was so cogent and convincing that it produced a deep impression, not only upon the English bench and bar, but even upon parliament, and it ultimately led to an amendment of the act by the addition of the following clause, which has undoubtedly averted the anticipated danger: 'Generally, in all matters in which there is any conflict or variance between the rules of equity and the rules of the common law with reference to the same matter, the rules of equity shall prevail.' " (1 Pomeroy's Equity Jurisprudence [5th ed, Symons], pp xxiii, xxiv.)

Chafee and Re tell the same story (Cases and Materials on Equity [4th ed], ch 1, § 2, pp 17, 18):

"To this [the English act] was added a section regulating certain special situations involved in the change, which concluded with the significant declaration that 'generally in all matters not hereinbefore particularly mentioned, in which there is any conflict or variance between the rules of equity and the rules of the common law, with reference to the same matter, the rules of equity shall prevail.' Thus equity, as before, was to have the last word, but now that word was to be spoken in time to foreclose the adverse word of the common law. This difference between the 2 statutes in the manner of approach accounts in some measure, at least, for the smoother working of the English system in the present regard."

Now what was Story's own position vis-a-vis Blackstone's insistence that equity be ruled by law? Mr. Justice Kelly's quotation of Blackstone (from Story) starts—but does not end—Story's connected discourse. Immediately following my Brother's quotation Judge Story, supported by enduring quotation

of Lord Kaims, proceeds as follows (This, I empha-
size, is Judge Story—not Blackstone—speaking):

"§ 16. Same—Yet it is by no means uncommon to
represent that the peculiar duty of a court of equity
is to supply the defects of the common law, and next,
to correct its rigor or injustice.   Lord Kaims avows,
this doctrine in various places and in language sing-
larly bold.   'It appears now clearly,' says he, 'that
a court of equity commences at the limits of the com-
mon law, and enforces benevolence where the law of
nature makes it our duty.   And thus a court of equity,'
accompanying the law of nature, in its general re-
finements enforces every natural duty that is not
provided for at common law.'   And in another place
he adds, a court of equity boldly undertakes 'to cor-
rect or mitigate the rigor, and what in a proper sense
may be termed the injustice of the common law.'"
(1 Story's Equity Jurisprudence [14th ed], p 17.)

And what is Story's own summation?   He gives it
by footnote (same page):

"Lord Kaims's remarks are entitled to the more
consideration, because they seem to have received in
some measure at least the approbation of Lord Hard-
wicke (Parke's Hist of Chan Appx 501, 502; *Id.* 333,
334); and also from Mr. Justice Blackstone's having
thought them worthy of a formal refutation in his
commentaries.   (3 Black Comm 436.)"

I turn next to Pomeroy.   Mr. Justice Kelly quotes
entire section 47 of Pomeroy's work, the text of which
declares that no court of chancery would consciously
attempt to correct the severity of the law, or to sup-
ply its defects, to any extent or under any circum-
stances, "beyond the already-settled principles of
equity jurisprudence."   Of course this is true.   No
one has ever suggested, so far as our reports disclose,
that any chancellor of Michigan should step beyond
or over the *settled principles of equity.*   So our
present disagreement turns on the pivot question:

What are these settled principles of equity? Pomeroy—presumably a reliable authority since my Brother has quoted him in continuing detail—supplies the answer in terms of praiseworthy certainty.

Let us read on into Pomeroy's introductory chapter; the chapter our Brother has opened at page 61. In the very next section (section 48, p 63) we find the author, proceeding step by step in masterful exposition of the true and proudly independent office of equity, writing this:

"The very growth of equity, as long as it was in its formative period, was from its essential nature an antagonism to the common law, either by way of adding doctrines and rules which the law simply did not contain, or by way of creating doctrines and rules contradictory to those which the law had settled and would have applied to the same facts and circumstances. It would be a downright absurdity, a flat contradiction to the plainest teachings of history, to deny that the process of building up the system of equity involved and required on the part of the chancellors an invasion, disregard, and even open violation of many established rules of the common law; in no other way could the system of equity jurisprudence have been commenced and continued so as to arrive at its present proportions."

Having engaged these premises, Pomeroy goes on (under the heading "Establishment of Equitable Doctrines Contrary to Legal Dogmas") to develop the exalted force and weight of equity's conscience in action (pp 65–67):

"How far the early chancellors went in recognizing and upholding primary rights and granting remedies, which were not only overlooked, but were expressly denied, refused and prohibited by positive and well-settled rules of the common law, is seen from a brief summary of a few instances in which such equitable doctrines were established in contra-

diction to legal dogmas. One executor or joint tenant might sue his coexecutor or cotenant in the court of chancery in respect to their joint interests, although forbidden to do so by the law. * * *

"Again, the court of chancery, acting upon its equitable principles, relieved parties in many instances from forfeitures which had been clearly incurred according to express rules of the law, and which courts of law still enforced according to the strictest letter of the provisions from which they resulted.

"Notwithstanding statutes which prohibited the court of chancery from reviewing judgments rendered by the courts of law, the chancellor gave relief, where it was demanded by equity and good conscience, against the operation of such judgments. He avoided the express prohibitory language of the statutes by not assuming to act directly upon the judgment itself, but upon the parties personally, by restraining the one who had recovered the judgment from taking or prosecuting any measures for its enforcement, and even by compelling him to restore the property which he had acquired by its means. There is no higher example of the equity jurisdiction than this, nor one which more directly interferes with the administration of the law, since the legal right controverted and overthrown by chancery no longer existed in the form of an abstract rule, but had been established in a concrete form as the right existing between the parties."*

I return at this point to the subject of Blackstone's questionable value as an authority in the areas occupied by equity. Pomeroy (see his footnote, 1 Pomeroy's Equity Jurisprudence [5th ed, Symons], § 54, p 70), having noted that "Blackstone, being

---

* No student, reading Pomeroy with view toward thoughtful understanding of equity's purposes and boundless possibilities, ever would be misled with respect to Pomeroy's position that the court of chancery, once it is shown that which is of such appealing force as to quicken the conscience into action, does not necessarily follow the law.

purely a common-law lawyer, had little knowledge of
equity, and his authority concerning its principles
and jurisdiction was never great," wrote this into his
text (same section and page):

"Sir William Blackstone, citing these and some
other instances in which the court of chancery re-
frained from interfering with legal doctrines, and
using them as the basis of his argument, goes to the
extent of denying that equity has or ever had any
power to correct the common law or to abate its
rigor. This is one example among many of Black-
stone's utter inability to comprehend the real spirit
and workings of the English law. That equity did to
a large extent interfere with and prevent the prac-
tical operation of legal rules, and did thus furnish to
suitors a corrective of the harshness and injustice of
the common law, history and the very existing sys-
tem incontestably show; and that the chancellors,
from motives of policy or otherwise, refrained from
exercising their reformatory function in certain in-
stances, is not, in the face of the historical facts, any
argument against the existence of the power. And
even in the present condition of equity as an estab-
lished department of the national jurisprudence,
whenever a court determines the rights of parties by
enforcing an equitable doctrine which differs from
and perhaps conflicts with the legal rule applicable to
the same facts, such court does still, in very truth,
exercise a corrective function, and wield an authority
by which it relieves the rigor and often the injustice
of the common law. It is undoubtedly true that a
court of equity no longer inaugurates new attacks
upon legal doctrines, and confines itself to the appli-
cation of principles already settled; but it is none the
less true that a large part of the equity which is daily
administered consists in doctrines which modify and
contradict as well as supplement the rules of the
law."

Do Blackstone's notions prevail in the enlightened
courts of this country? One of the most noteworthy

answers comes from the gifted pen of the late and revered Judge John J. Parker, of the 4th judicial circuit (nominee of President Hoover, in 1930, for appointment to the Federal supreme court). In *Bowen* v. *Hockley,* 71 F2d 781 (94 ALR 856), the court was confronted with contention that, no statutory provision having been made for payment, by receivers of an employer, of an award of workmen's compensation made against the employer prior to receivership, a court of equity could not compel such payment. The court, speaking through Judge Parker, replied this way (p 786):

"One of the glories of equity jurisprudence is that it is not bound by the strict rules of the common law, but can mold its decrees to do justice amid all the vicissitudes and intricacies of life. The principles upon which it proceeds are eternal; but their application in a changing world will necessarily change to meet changed situations. If relief had been granted only where precedent could be found for it, this great system would never have been developed; and, if such a narrow view of equitable powers is adopted now, the result will be the return of the rigid and unyielding system which equity jurisprudence was designed to remedy. As was well said by Prof. Pomeroy (1 Equity Jurisprudence [4th ed], § 60): 'The general language of some writers, and particularly of Blackstone, presents an erroneous theory as to the office of precedents in equity, and if followed, would check and abridge the beneficent operation of its jurisdiction. The true function of precedents is that of illustrating principles; they are examples of the manner and extent to which principles have been applied; they are the landmarks by which the court determines the course and direction in which principles have been carried. But with all this guiding, limiting, and restraining efficacy of prior decisions, the chancellor always has had, and always must have, a certain power and freedom of action, not possessed

by the courts of law, of adapting the doctrines which he administers.  He can extend those doctrines to new relations, and shape his remedies to new circumstances, if the relations and circumstances come within the principles of equity, where a court of law in analogous cases would be powerless to give any relief.  In fact, there is no limit to the various forms and kinds of specific remedy which he may grant, adapted to novel conditions of right and obligation, which are constantly arising from the movements of society.  While it must be admitted that the broad and fruitful principles of equity have been established, and cannot be changed by any judicial action, still it should never be forgotten that these principles, based as they are upon a Divine morality, possess an inherent vitality and a capacity of expansion, so as ever to meet the wants of a progressive civilization.' "[*]

Mr. Justice KELLY notes that I have "not commented" upon the majority opinion of *Consumers* and other like chanteys of equity's 11th and—I respectfully suggest—least understood maxim ("Equity follows the law").  Now, having been challenged, I would advance initially the vigorous comment of another; the great juristic teacher of the present century.  That which follows is read and accepted today as righteous gospel in most of the courts and law schools of our land.  It is submitted again (as in *Farr* v. *Nordman, supra,* 274) as follows:

[*] This is Pomeroy's most illustrious passage.  It is one every chancellor should read, and reread from time to time, as he would the Beatitudes and Ten Commandments.  See its employment in *Ar-Tik Systems* v. *Lark Sales Co.,* 12 Ill App 2d 304, 336 (139 NE2d 308, 324).  And for like declarations, see *Union Pacific R. Co.* v. *Chicago, R. I. & P. R. Co.,* 163 US 564, 601 (16 S Ct 1173, 41 L ed 265) ; *Vanderbilt* v. *Mitchell,* 72 NJ Eq 910, 917 (67 A 97, 101, 102, 14 LRA NS 304) ; *Columbian Athletic Club* v. *State,* 143 Ind 98, 102 (40 NE 914, 915, 916, 28 LRA 727, 52 Am St Rep 407) ; *Ball* v. *Victor Adding Machine Co.* (CCA), 236 F2d 170, 174, 175 ; *Pierce* v. *Proprietors of Swan Point Cemetery,* 10 RI 227, 241 (14 Am Rep 667, 680).

"Equity follows the law, but not slavishly nor always. *Hedges* v. *Dixon County,* 150 US 182, 192 (14 S Ct 71, 37 L ed 1044). If it did, there could never be occasion for the enforcement of equitable doctrine. 13 Halsbury, Laws of England, p 68.   *   *   *

"True, indeed, it is that accident and mistake will often be inadequate to supply a basis for the granting or withholding of equitable remedies where the consequences to be corrected might have been avoided if the victim of the misfortune had ordered his affairs with reasonable diligence. *United States* v. *Ames,* 99 US 35, 47 (25 L ed 295) ; *Grymes* v. *Sanders,* 93 US 55 (23 L ed 798) ; *Noyes* v. *Clark,* 7 Paige (NY) 179 (32 Am Dec 620). The restriction, however, is not obdurate, for always the gravity of the fault must be compared with the gravity of the hardship. *Noyes* v. *Anderson,* 124 NY 175 (26 NE 316, 21 Am St Rep 657) ; *Lawrence* v. *American National Bank,* 54 NY 432; *Ball* v. *Shepard,* 202 NY 247, 253 (95 NE 719). Let the hardship be strong enough and equity will find a way, though many a formula of inaction may seem to bar the path. *Griswold* v. *Hazard,* 141 US 260, 284 (11 S Ct 972, 999, 35 L ed 678)." (Cardozo, C. J., dissenting in *Graf* v. *Hope Building Corp.,* 254 NY 1 [171 NE 884, 70 ALR 984]).

Pomeroy says, of the mentioned 11th maxim:

"The maxim is, in truth, operative only within a very narrow range; to raise it to the position of a general principle would be a palpable error. Throughout the great mass of its jurisprudence, equity, instead of following the law, either ignores or openly disregards and opposes the law." (2 Pomeroy's Equity Jurisprudence [5th ed, Symons], § 427, p 194).

My own invited—and, hence, not gratuitous— "comment" upon the majority opinion of *Consumers,* and the remaining equity cases gathered in Mr. Justice Kelly's present opinion, is that each should be put through the reform school of equity's great doc-

trines, the better to graduate with Cardozo's qualification that equity's ordinary pursuit of the law is never slavish and that she ever stands ready to relieve the oppressed from the oppressor's demand for possession or retention of an iniquitously exacted pound of material and sometimes personal flesh. Sure, in the ordinary case of error of assessment of property taxes, the remedy provided by hearing before the board of review is final and exclusive. But where, as rightfully found by the chancellor below, the "mistake (is) of such significance as to constitute * * * a constructive fraud," equity's door in all learned courts is firmly held open to the innocent, if careless, victim of such fraud. (To repeat Cardozo above: "Let the hardship be strong enough and equity will find a way, though many a formula of inaction may seem to bar the path.") This does not mean that the purport hereof is one of general grant, to early or late protestants of property tax assessments, of an additional or alternative remedy over and above the one afforded, by statute, before the board of review. It is to say only that the known remedy provided by equity, in favor of those actually or constructively defrauded, is available now as before in every case—involving taxation or otherwise—where the presented facts are sufficient to shock the conscience of the chancellor.

*To conclude:* One is led to wonder whether any weight—any evidentiary persuasion whatever—of proven equity would move our distinguished Brethren to relieve an appealing taxpayer from the rigors of *Consumers.* Suppose, in *Consumers,* that the decimals had been carried yet farther to the right so that an even greater—much greater—overpayment had been innocently made. Or suppose (in the case before us) that these vacant lots, theretofore properly assessed at valuations ranging from $150 to $400, had been assessed for the year 1956 at, say, $55,000

each instead of $5,500 each (let no one say, our opinions of *Consumers Power Company* v. *County of Muskegon* lying open before us, that such things cannot happen). Would our Brothers—sorrowfully of course—continue in either circumstance their wiredrawn adherence to control by law over equity? The answer, probably, is affirmative. And so today's controversy must wend its weary way onward, past this Oakland county tax case, toward the hope and— I predict—the assured light of the future.

The majority opinion of *Consumers Power Company* v. *County of Muskegon,* if left alive in our books, is bad for Michigan from every standpoint. It does our Court no credit, and bids fair to interfere with the necessary processes of good-faith tax payment. Consider for a moment that Michigan's major taxpayers (in other areas of levy) have been asked and doubtless will be asked to assist, by premature payment, in meeting the State's now chronic financial crises. Necessarily these payments have been made and must be made on the basis of estimates and ahead-of-time calculations. Such practice, inherently, is fruitful of honest and before-the-fact error. Now, in this very year of urgent concern, our divided Court again leaves the Samaritans of Michigan in doubt upon the question whether they may receive relief, in the courts, in event they ultimately discover overpayment on their part. What would we do should Ford Motor or General Motors overpay, say, $500,000, followed by righteous appeal on their part for judicial relief? Ah, there is a piquant question. Would that it were here, for decision in a companion case.

Two eminent jurists of our State, Judge Smith of the 20th circuit and Judge Adams of the 6th circuit, the latter being a former distinguished member of this Court, have attested due support of the equitable doctrines found in Mr. Justice Smith's opinion of

*Consumers.*   So have 2 present members of this Court.   Surely, by this time, it should be evident that an inadvertent error of decision was made in *Consumers,* just as in *Romatz, supra.*   Should we so decide by majority vote, it would become unnecessary to consider effect, retroactive or otherwise, of the *pendente* legislative enactment to which counsel refer in their brief (PA 1958, No 209, § 53a [CL 1948, § 211.53a (Stat Ann 1959 Cum Supp § 7.97[1])]),* by which the legislature since handing down of *Consumers* and entry of decree herein has provided (so far as concerns property taxes) what our majority in *Consumers* should have upheld, that is, the right of taxpayers to equitable relief from the unconscionable effect of crass mistakes of public officials in the field of taxation; mistakes gross enough to constitute fraud.

I vote to reverse and remand for entry of decree in accord with the expressed will of the chancellor, thus overruling *Consumers Power Co.* v. *County of Muskegon,* 346 Mich 243.   No costs.

Smith, Edwards, Voelker, and Kavanagh, JJ., concur with Black, J.

Kelly, J. (*dissenting*).   The chancellor found:

"Although plaintiff must be charged with constructive knowledge of the existence and amount of the 1956 assessment, it did not receive a tax statement from the new city in that year and, hence, did not have actual knowledge of the excessive assessment until April, 1957, when it attempted to pay the tax on one of the lots.   It then offered to pay the tax to the

---

* The general rule is that a legislative enactment will not be presumed as having retroactive effect (*Harrison* v. *Metz*, 17 Mich 377, 382; *Bullinger* v. *Gremore*, 343 Mich 516, 535).   For application of such presumption to a statute providing reimbursement (of paid taxes) in favor of the defeated holder of a tax deed, see *Shaw* v. *Morley*, 89 Mich 313.

county treasurer under protest but that offer was refused. Obviously and it is conceded, the plaintiff neither appeared before the board of review nor made prior inquiry at the city offices in regard to the assessment."

It is difficult to assume that plaintiffs, engaged in land transactions, did not know that the 1956 tax was due in July, 1956. Appellants cannot rely upon the fact that they did not receive a tax notice to excuse their failure to make any effort to pay the July, 1956, levied tax until March, 1957. The chancellor correctly found that under our tax laws "plaintiff must be charged with constructive knowledge of the existence and amount of the 1956 assessment."

Appellants' chancery action asks the chancellor to hold that the tax for 1956 be considered as paid under protest. Appellants never paid nor offered to pay the 1956 tax, but requested the county treasurer to accept the 1957 assessment in lieu of the 1956, contrary to the provisions of CL 1948, § 211.58 (Stat Ann 1950 Rev § 7.102), which provides: "That neither taxes nor special assessments which are delinquent may be paid under protest to the county treasurer." Appellants appealed to the court because the county treasurer refused to violate the statute.

It is conceded that appellants did not appear before the board of review. The board of review was created by law to correct alleged erroneous assessments, and appellants were subject to the jurisdiction of said board. Failing to take advantage of the relief the board was authorized by law to grant, appellants were estopped to seek relief in court, as established by the following decisions:

*First National Bank of St. Joseph* v. *Township of St. Joseph,* 46 Mich 526, 530:

"If a person does not see fit to have his assessment corrected and perfected, when it is in his power to do

so, it must be assumed that a failure to complain is equivalent to an admission of correctness."

*Meade* v. *Haines,* 81 Mich 261, 265:

"The plaintiff did not appear before this board, nor in any manner avail himself of its provisions, to correct the alleged erroneous assessment. This is a complete bar to his recovery here, even if he could otherwise maintain his suit."

*Fletcher Paper Co.* v. *City of Alpena,* 172 Mich 35, 39:

"It is well settled by the repeated decisions of this Court, covering a period of more than 30 years, that the board of review is the constituted tribunal for the correction of unjust or unequal assessments, and that a taxpayer who is subject to the board's jurisdiction, and fails to make his appeal to that tribunal, cannot later appeal to the courts for redress. The board of review is a tribunal provided by law in which the taxpayer may appear and contest an unequal or excessive assessment; and his failure to so appear estops him from assailing the assessment afterwards."

The statutory provisions and previous decisions of this Court, which I believe applicable to this appeal, are not commented upon by Justice BLACK—evidently on the theory that they can be ignored by a chancellor applying equity.

In *Sorrick* v. *Consolidated Telephone Company of Springport,* 340 Mich 463, 469, we said:

"It must be admitted that the equities of the case are strongly in favor of defendant. However, we are unable to close our eyes to another fundamental rule of equity, *i.e.,* that equity follows the law."

In *J. W. McCausey & Co.* v. *Gittleman,* 201 Mich 8, 16, we said:

"We do not conceive that the plainly expressed provisions of the lien law are less imperative because

by the statute a chancery court is made the forum in which the attached liens may be enforced. While equity courts are said to be given special jurisdiction to deal with and correct that wherein the law is deficient because of its universality, they do not rise above or have power to change the law, either statute or common."

In *Consumers Power Company* v. *County of Muskegon*, 346 Mich 243, 247, we stated:

: "Contrary to the theory that we should apply the general equitable rules in a taxation case of this nature are the cases of *Langford* v. *Auditor General*, 325 Mich 585; and *Bateson* v. *City of Detroit*, 143 Mich 582. In the *Langford Case* we stated (pp 590, 591):

" 'Governmental powers of taxation are controlled by constitutional and statutory provisions. *C. F. Smith Co.* v. *Fitzgerald*, 270 Mich 659. Hence, it is not possible to adjudicate issues arising under taxation laws by the general application of equitable principles. This phase of the law seems to have been overlooked by plaintiffs who stress their right to relief in the instant case on equitable, rather than legal, grounds.

" ' "The collection of duly levied taxes for governmental purposes is a governmental function and the collection officer cannot, by mistake or misinformation, work an estoppel, enforceable in a court of equity. The fact, and not the misinformation, controls." *Lovett* v. *City of Detroit*, 286 Mich 159, 161, 162.' "

In *Corkins* v. *Ritter*, 326 Mich 563, 568, we said:

"If plaintiff could not have a new trial, it follows he could not bring a separate action in equity, as equity will not allow indirectly what may not be done directly."

In his opinion Justice BLACK asks this Court to overrule *Consumers Power Company* v. *County of Muskegon, supra.* In that case we held:

"Governmental powers of taxation are controlled by constitutional and statutory provisions."

"Issues arising under taxation laws may not be adjudicated by the general application of equitable principles."

"The equitable principles of 'windfall' and 'unjust enrichment' cannot be applied in an action at law to recover taxes not paid under protest."

"The obligation to pay taxes is purely a statutory creation, and taxes can be levied, assessed and collected only in the method pointed out by express statute, hence, refunds or a credit of taxes, even though erroneously paid, may not be made or even voluntarily refunded in the absence of statutory authority so to do." (Syllabi.)

Subsequent to our decision in *Consumers Power Company* v. *County of Muskegon, supra,* the legislature enacted PA 1958, No 209 (approved by the governor May 5, 1958), section 53a thereof providing:

"Any taxpayer who is assessed and pays taxes in excess of the correct and lawful amount due because of a clerical error or mutual mistake of fact made by the assessing officer and the taxpayer may recover the excess so paid, without interest, if suit is commenced within 3 years from the date of payment, notwithstanding that the payment was not made under protest." CL 1948, § 211.53a (Stat Ann 1959 Cum Supp § 7.97[1]).

I agree with my Brother that this provision is *pendente* legislative enactment and cannot be given retroactive effect, and add thereto that the amendment only affects taxpayers who are assessed and pay taxes in excess—which does not apply to appellants, who failed or refused to pay the tax.

I disagree with his statement that "the legislature since handing down of *Consumers* and entry of de-

cree herein has provided what our majority in *Consumers* should have upheld, that is, the right of a taxpayer to recover the amount of mistakenly levied and unconscionably collected property taxes."*

: This Court does not create the law governing taxation. To grant relief to taxpayers who failed to pay taxes within the prescribed time and who failed to appeal to the statutory created board of review, will necessitate legislative enactment to that effect.

This decision will not be confined to the appellants in this appeal, but will establish tax principles applicable to the huge number of property owners who constitute the taxpayers of our State. In regard to Justice Black's recommendation that the *Consumers Power Company Case, supra,* be overruled, I call attention that the adoption of his contention will constitute not only an overruling of *Consumers* but of numerous decisions of this Court (as referred to above), holding that: (1) Governmental powers of taxation are controlled by constitutional and statutory provisions, hence it is not possible to adjudicate issues arising under taxation laws by the general application of equitable provisions; (2) The collection of duly levied taxes for governmental purposes is a governmental function, and the collection officer cannot by mistake or misinformation work an estoppel enforceable in a court of equity; (3) The board of review is the constituted tribunal for the correction of unjust or unequal assessments, and a taxpayer who fails to make his appeal to that tribunal cannot later appeal to the courts for redress; (4) Delinquent taxes cannot under protest be paid to the county treasurer.

The adoption of the opinion to which I dissent would constitute a declaration on our part that while

---

* This quotation appeared in Justice Black's original opinion. The matter has been changed in the second and third revisions of his opinion.

we realize that the tax laws clearly, unequivocally and definitely notify property owners that they should not bring tax problems to the courts without first appealing to the board of review, we have, by this decision, decided not to follow this position in certain instances where the courts decide the tax collection would constitute unjust enrichment. If adopted, the questions naturally arise: What over-tax constitutes unjust enrichment? Is not the over-tax of $1 unjust enrichment to that amount? How long can the taxpayer wait after the time allowed him to appeal to the board of review before he commences his action in equity?

We are not dealing with a case where tax officials fraudulently conspired to overtax. A mistake was made. It clearly appears that the mistake could have been rectified by appellants had they requested relief from the board of review. If they had sought relief from the board and been denied, this Court would have granted relief.

To write exceptions to the tax laws eliminating the requirement that the taxpayer first seek relief from the board of review would create problems in our courts and with tax-collection officials which we refuse to create.

The decree should be affirmed. No costs, a public question being involved.

DETHMERS, C. J., and CARR, J., concurred with KELLY, J.