*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

WASHTENAW COUNTY PROSECUTOR and CITY OF YPSILANTI,

Plaintiffs-Appellees,

v

VALLEYTREE PARTNERS, LLC, VTP A1, LP, VTP ARBOR GP, LLC, VTP ARBOR JV, LP, VTP ARBOR ONE, LLC, VTP RIVER WOODS, LLC, SAMUEL ROSENTHAL, YAAKOV NUSBAUM, and AMY VUJNOV,

Defendants-Appellants,

and

MOSHE MENDLOWITZ, S & J SEALER CO., SUPERIOR LANDSCAPE COMPANIES, LLC,

Defendants.

UNPUBLISHED
January 16, 2026
10:23 AM

No. 376032
Washtenaw Circuit Court
LC No. 25-000262-CH

Before: RIORDAN, P.J., and MURRAY and MALDONADO, JJ.

PER CURIAM.

Defendants appeal by leave granted[1] the trial court's order granting plaintiffs' motion for a preliminary injunction regarding the conditions of apartments owned by defendants. Defendants argue that the trial court abused its discretion by granting the preliminary injunction because the traditional factors weighed against granting such extraordinary equitable relief. We affirm.

---

[1] *Washtenaw Co Prosecutor v ValleyTree Partners, LLC*, unpublished order of the Court of Appeals, entered July 17, 2025 (Docket No. 376032).

-1-

## I. BACKGROUND

Defendants own, operate, and manage Arbor One Apartments in Ypsilanti, a complex of 19 buildings that have approximately 474 rental units. The buildings are located on three parcels of land in groups identified as Arbor One North, Arbor One South, and Arbor One West. In February 2024, a fire occurred at one of the buildings located in Arbor One North. When defendants requested a permit to demolish and rebuild the fire-damaged building, the application contained a Hazardous Materials Report indicating the use of asbestos containing material in the building. In July 2024, the fire department responded to a fire alarm at another building in Arbor One North, determined the alarm was malfunctioning, but observed significant water damage and mold growth on the walls and kitchen cabinets of the unit. At the request of the fire department, the City's Building Department Manager inspected the building and intervened to require immediate relocation of the tenant. The Building Department Manager also observed demolition work being performed without a permit and without proper safety procedures in place at the fire-damaged building.

After the inspection and discovery of work being done without a permit, the City began inspecting the exterior and interior of each building at Arbor One and issued numerous corrective action notices to defendants. The alleged violations included the following:

a. Performing demolition work at 773 Green Road without a permit, corresponding disposal of asbestos without required licenses, permits and safeguards, and retention of resulting debris on site.

b. Damage/deterioration of the roof and roofing materials.

c. Broken and/or missing windows and window screens.

d. Missing/damaged siding, paint, and/or other exterior protective materials.

e. Damaged/unsecure exterior entry doors, permitting trespassers to freely enter buildings.

f. Damaged/unsecure interior and exterior entry doors to utility/boiler rooms.

g. Severe and unmitigated long-term infestation of vermin.

h. Gaps/holes in exterior walls.

i. Deteriorating/poorly repaired exterior brickwork.

j. Leaking/rusted/broken pipes/drains/fixtures.

k. Permitting unauthorized occupancy in utility rooms and under stairwells.

l. Furnaces and boilers are in poor or inoperable condition, or otherwise repaired/installed without required permits or inspections.

m. Damaged air conditioning units.

n. Water damage and mold growth/accumulation in rental units.

o. Damaged/inoperable heating registers in rental units.

p. Permitting use of space heaters and stoves as ambient heat source within rental units.

q. Accumulation of trash, debris, combustibles, human and animal waste, and food waste.

r. Lack of working utilities.

s. Damaged and/or nonfunctioning smoke detectors.

t. Loose/exposed/hanging high and low voltage wires.

u. Allowing unauthorized occupancy of vacant units.

v. Work being performed without required permits or inspections.

w. Incomplete repairs, including open drywall, and improper water, mold, and sewage remediation.

x. Buckling flooring.

y. Damaged or missing fixtures.

z. Holes in fire wall barriers.

aa. Caulking being used to seal exterior brick mortar joints and large holes in siding, rather than using proper materials and workmanship.

bb. Brick sealing of an exterior wall at 815 Green Road such that exhaust from heating units is unable to ventilate to the outside air.

cc. Offering units for rental without a valid Certificate of Compliance and without advising prospective tenants of the foregoing conditions being present.

By February 2025, the City had condemned every building in Arbor One and revoked all certificates of compliance necessary to lawfully rent the property.

In March 2025, plaintiffs initiated the present action alleging that defendants had created and maintained a public nuisance; violated the Housing Law of Michigan, MCL 125.401 *et seq*.; and violated the Michigan Consumer Protection Act, MCL 445.901 *et seq*. Plaintiffs alleged that, despite the revocations of the certificates of compliance and condemnation of the buildings, defendants continued to solicit prospective tenants and execute lease agreements, demand or collect rent from tenants, and misrepresent Arbor One Apartment as being fit for human habitation.

Shortly after initiating the action, plaintiffs sought a preliminary injunction requiring defendants to: provide temporary alternative shelter for tenants whose residences must be vacated for health and safety reasons; provide relocation for any tenant who wished to relocate from the property; immediately perform emergency repairs; stop advertising, soliciting, or leasing units that lacked a certificate of compliance; and stop unlawfully demanding rent for dwellings lacking a certificate of compliance. In support of their motion, plaintiffs provided affidavits of city officials who inspected and observed violations at the property and affidavits of current residents describing the persistently poor conditions in their homes. Defendants argued that injunctive relief was unnecessary because defendants were actively remediating the property and that the lack of a certificate of compliance did not relieve tenants of their obligation to pay rent.

After several hearings, the trial court entered an order partially granting plaintiffs a preliminary injunction. The trial court found that plaintiffs had a likelihood of success on the merits because it was not "seriously debated that the properties had fallen into a state of disrepair." The trial court found that the "health conditions" constituted irreparable harm and that it was in the public interest that tenants not be forced to live in apartments that presented serious health risks. Lastly, the trial court found that the balance of harm favored the tenants, but in so finding the court did not grant all the requested relief, continuing to allow defendants to advertise and solicit prospective tenants. Accordingly, the trial court ordered defendants to provide relocation assistance for any tenant who wished to relocate from the property, enjoined defendants from demanding rent from tenants for periods in which the property lacked certificates of compliance, ordered repairs to the property, and required defendants to provide temporary alternative shelter for displaced tenants. Further, the trial court ordered that any tenant who wished to leave an apartment that did not have a certificate of compliance would be permitted to do so.

## II. STANDARD OF REVIEW

"[A] trial court's decision to grant injunctive relief is reviewed for an abuse of discretion." *Johnson v Mich Minority Purchasing Council*, 341 Mich App 1, 8; 988 NW2d 800 (2022) (quotation marks and citation omitted; alteration in original). A court abuses its discretion when its decision falls "outside the range of reasonable and principled outcomes." *Barrow v Wayne Co Bd of Canvassers*, 341 Mich App 473, 484; 991 NW2d 610 (2022).

## III. ANALYSIS

Defendants argue on appeal that the trial court erred by granting plaintiffs a preliminary injunction because the factors weighed against granting such extraordinary relief.

An injunction is an "extraordinary remedy that issues only when justice requires, there is no adequate remedy at law, and there exists a real and imminent danger of irreparable injury." *Davis v Detroit Fin Review Team*, 296 Mich App 568, 613-614; 821 NW2d 896 (2012) (quotation marks and citation omitted). "The purpose of a preliminary injunction is to preserve the status quo pending a final hearing regarding the parties' rights." *Hammel v Speaker of House of Representatives*, 297 Mich App 641, 647; 825 NW2d 616 (2012) (quotation marks and citation omitted). "To obtain a preliminary injunction, the moving party bears the burden of proving that the traditional four elements favor the issuance of a preliminary injunction." *Id*. at 648 (quotation

marks and citation omitted). See also MCR 3.310(A)(4). Accordingly, when determining whether to grant a preliminary injunction, the trial court must consider:

> (1) whether the applicant has demonstrated that irreparable harm will occur without the issuance of an injunction, (2) whether the applicant is likely to prevail on the merits, (3) whether the harm to the applicant absent an injunction outweighs the harm an injunction would cause to the adverse party, and (4) whether the public interest will be harmed if a preliminary injunction is issued. [*Slis v Michigan*, 332 Mich App 312, 337; 956 NW2d 569 (2020).]

The traditional factors are a guide to the trial court's exercise of its equitable power and not rigid and unbending requirements. *Johnson*, 341 Mich App at 25.

## A. LIKELIHOOD OF SUCCESS

First, "[i]n order to justify the extraordinary remedy of a preliminary injunction, the moving party *must* show a likelihood that it will succeed on the merits of the claim." *Council of Organizations & Others for Ed About Parochiaid v Michigan*, 501 Mich 1015, 1019; 913 NW2d 631 (2018) (MARKMAN, C.J., dissenting) (quotation marks and citation omitted).

Plaintiffs brought claims under the Housing Law of Michigan, the Michigan Consumer Protection Act, and a common law claim that defendants were operating and maintaining a public nuisance. Although failing to discuss each claim individually, the trial court found generally that plaintiffs had a likelihood of success on the merits because it was not "seriously debated that the properties had fallen into a state of disrepair."

On appeal, defendants only dispute the trial court's finding that plaintiffs were likely to succeed on their consumer protection act claim. As to the non-MCPA claims, the record, primarily the affidavits of the city officials who inspected the property and of current residents, supports the trial court's finding that there was a likelihood of success on plaintiffs' claim that the poor conditions violated several provisions of the Michigan Housing Law, including failing to maintain plumbing, heating, ventilation, and electrical wiring in good repair, MCL 125.471; and maintaining housing that was dangerous to human life, MCL 125.402(18). Similarly, the documented poor condition of the property established a likelihood of success on plaintiff's claim that defendants were operating a public nuisance that imperiled the health, safety, and welfare of the tenants, prospective tenants, and the public. See *Ypsilanti Charter Twp v Kircher*, 281 Mich App 251, 270-271; 761 NW2d 761 (2008). Notably, defendants do not argue that the trial court abused its discretion by finding a likelihood of success on the merits of these claims and have not presented any evidence that the identified problems with the heating and plumbing in the buildings did not exist. On this basis alone, the trial court's finding that this factor favored plaintiffs would not be an abuse of discretion. See, e.g., *Johnson*, 341 Mich App at 25.

Nevertheless, turning to the MCPA claim, the statute prohibits the use of "unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." MCL 445.903(1). "Trade or commerce" is defined as

> the conduct of a business providing goods, property, or service primarily for personal, family, or household purposes and includes the advertising, solicitation,

-5-

offering for sale or rent, sale, lease, or distribution of a service or property, tangible or intangible, real, personal, or mixed, or any other article, or a business opportunity. [MCL 445.902(g).]

Plaintiffs alleged that defendants violated the act in multiple ways, including by demanding rent from tenants without the legal right to do so, alleging that the demand of rent violated the act by causing a probability of confusion regarding the certification of the apartments, MCL 445.903(1)(a); misrepresenting the characteristics and quality of the apartments, MCL 445.901(1)(c), (e); causing a probability of confusion as to the legal rights of the parties, MCL 445.903(1)(n); misrepresented the facts regarding the ability to collect rent, MCL 445.901(1)(bb); and failed to reveal facts material to the transaction, MCL 445.903(1)(cc).

Defendants argue that there was no likelihood of success on this particular claim because the Housing Law of Michigan, MCL 125.530(3), preempted the City's ordinance purporting to suspend or prohibit a tenants' obligation to pay rent without a valid certificate of compliance.[2] Under the City of Ypsilanti City Code, § 58-122(a)(2), "[a]ny residential premises failing to have a valid certificate of compliance from the city building inspection department is not in compliance with the health and safety laws of the city." The City Code prohibits landlords from obligating tenants to pay rent without a certificate of compliance. Ypsilanti Code, § 58-122(d). Defendants argue that the City's ordinance directly conflicts with MCL 125.530, which provides in relevant part, as follows:

(3) The duty to pay rent in accordance with the terms of any lease or agreement or under the provisions of any statute shall be suspended and the suspended rentals shall be paid into an escrow account as provided in subsection (4), during that period when the premises have not been issued a certificate of compliance, or when such certificate, once issued, has been suspended. This subsection does not apply until the owner has had a reasonable time after the effective date of this article or after notice of violations to make application for a temporary certificate, as provided in section 131. Nor does this subsection apply where the owner establishes that the conditions which constitute a hazard to health or safety were caused by the occupant or occupants. The rent, once suspended, shall again become due in accordance with the terms of the lease or agreement or statute from and after the time of reinstatement of the certificate, or where a temporary certificate has been issued, as provided in section 131.

(4) Rents due for the period during which rent is suspended shall be paid into an escrow account established by the enforcing officer or agency, to be paid thereafter to the landlord or any other party authorized to make repairs, to defray the cost of correcting the violations. The enforcing agency shall return any unexpended part of sums paid under this section, attributable to the unexpired portion of the rental period, where the occupant terminates his tenancy or right to occupy prior to the undertaking to repair. [Footnote omitted.]

---

[2] The issue was adequately preserved in the trial court.

However, the Housing Law also gives cities the authority to "impos[e] requirements higher than the minimum requirements laid down in this act," MCL 125.408, and explicitly states that "[t]his act does not preempt, preclude, or interfere with the authority of a municipality to protect the health, safety, and general welfare of the public through ordinance, charter, or other means," MCL 125.534(8). The Housing Law expressly does not preempt the authority of cities to provide greater protection to tenants than does the Housing Law. Defendants' argument to the contrary is simply without merit.

## B. IRREPARABLE HARM

"[A] particularized showing of irreparable harm is an indispensable requirement to obtain a preliminary injunction." *Pontiac Fire Fighters Union Local 376 v Pontiac*, 482 Mich 1, 9; 753 NW2d 595 (2008) (quotation marks, citation, and alterations omitted). "The mere apprehension of future injury or damage cannot be the basis for injunctive relief." *Id*. However, that is not to say "that irreparable harm must have already occurred in order for [preliminary] injunctive relief to be available." *Mich Coalition of State Employee Unions v Mich Civil Serv Comm*, 465 Mich 212, 228; 634 NW2d 692 (2001) (quotation marks and citation omitted). A preliminary injunction may be appropriate if it is demonstrated that the plaintiffs will suffer irreparable injury absent an injunction. *Id*. "Equally important is that a preliminary injunction should not issue where an adequate legal remedy is available." *Pontiac Fire Fighters*, 482 Mich at 9.

As noted, the trial court held that the "health conditions" at Arbor One were "issues of irreparable harm." Although the trial court's analysis of this factor was brief, review of the record supports the court's conclusion that the conditions at Arbor One posed an imminent risk of irreparable harm to the health, safety, and welfare of the tenants and could cause harm to potential new tenants. The affidavits of city officials who inspected the property and of the current residents set forth significant issues such as inoperable heating systems, leaking and broken plumbing, mold growth, sewage backups, and infestations. Defendants largely do not dispute the conditions of the property, instead arguing that there is no irreparable harm because they have made "significant strides" in making repairs. However, given the scope of the issues with the property and the continued lack of certificates of compliance, the trial court did not clearly err by finding that irreparable harm would occur without the issuance of a preliminary injunction. Although aspects of the relief provided by the trial court's injunction involved rent and could be addressed with monetary damages, the trial court did not err in concluding that there is no adequate remedy at law to address the irreparable harm to the health and safety of the tenants. The trial court properly found that this factor also weighs in favor of the injunction.

## C. PUBLIC INTEREST

Similarly, the trial court did not err in granting preliminary injunctive relief to safeguard the health and well-being of the tenants and anyone seeking to rent in Ypsilanti, and doing so would not harm the public interest. See *Slis*, 332 Mich App at 333. The trial court concluded that it was in the public interest to ensure that tenants were not forced to live in apartments that present serious health risks and are not in compliance with local health codes. On appeal, defendants argue only that the "mutually agreed upon remediation plan sufficiently serves the public interest," obviating the need for a preliminary injunction. As discussed earlier, defendants' efforts to repair

the conditions do not extinguish the serious health and safety concerns presented by plaintiffs' evidence.

## D.  BALANCE OF HARMS

Finally, as to whether "the harm to the applicant absent such an injunction outweighs the harm it would cause the adverse party," *Detroit Fire Fighters Ass'n, IAFF Local 344 v Detroit*, 482 Mich 18, 34; 753 NW2d 579 (2008), the trial court found that the balance of harms weighed in favor of granting an injunction.  According to the trial court, the risk to the health and welfare of the tenants is an irreparable harm that clearly outweighs the purely monetary harm to defendants. In light of the evidence discussed above, we cannot contend that the trial court erred in finding that this factor weighted in favor of injunctive relief.

Separately, defendants argue that the trial court provided relief that forces them to perform obligations that are not required under any statutory or common law.  But the trial court is utilizing its equitable powers to craft an appropriate remedy in light of the particular facts of the present case, and as discussed in *Tkachik v Mandeville*, 487 Mich 38, 45-46; 790 NW2d 260 (2010):

> Equity jurisprudence " 'mold[s] its decrees to do justice amid all the vicissitudes and intricacies of life.' " *Spoon–Shacket Co, Inc v Oakland Co*, 356 Mich 151, 163; 97 NW2d 25 (1959) (citation omitted).  While legislative action that provides an adequate remedy by statute precludes equitable relief, the absence of such action does not.  This is so because "[e]very equitable right or interest derives not from a declaration of substantive law, but from the broad and flexible jurisdiction of courts of equity to afford remedial relief, where justice and good conscience so dictate."  30A CJS, Equity, § 93, at 289 (1992).  Equity allows "complete justice" to be done in a case by "adapt[ing] its judgment[s] to the special circumstances of the case."  27A Am Jur 2d, Equity, § 2, at 520-521.

Accordingly, that the trial court did not rely on particular statutory authority when crafting the terms of the injunction is not a death-knell to this form of relief.

Affirmed.

/s/ Michael J. Riordan
/s/ Christopher M. Murray
/s/ Allie Greenleaf Maldonado