*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SANFORD LAKE PRESERVATION
ASSOCIATION, also known as FOUR LAKES
TASK FORCE,

       Plaintiff/Counterdefendant/Cross-
       Defendant-Appellee,

v

JILL COUCH, formerly known as JILL M.
DENTON,

       Defendant/Counterplaintiff/Third-
       Party Plaintiff/Cross-Defendant-
       Appellant,

and

LEONARD STREET ASSOCIATION and JARED
AYRES,

       Third-Party Defendants/Cross-
       Plaintiffs-Appellees,

and

ANDREA AYRES, JEFF GUERNSEY, SHARON
GUERNSEY, SUSAN BALCIRAK, HOLLY
KUKLA, and LEO KUKLA,

       Third-Party
       Defendants/Counterplaintiffs/Cross-
       Plaintiffs-Appellees,

and

COUNTY OF MIDLAND,

UNPUBLISHED
June 13, 2024

No. 363020
Midland Circuit Court
LC No. 18-005610-CH

Third-Party Defendant-Appellee.

Before:  MALDONADO, P.J., and MARKEY and K. F. KELLY, JJ.

PER CURIAM.

In this property dispute, appellant, Jill Couch, appeals by right an order entered after a bench trial.  Some of the disputed issues were also decided via summary disposition pursuant to MCR 2.116(C)(10) (no genuine issue of material fact).  The court concluded that Couch needed to remove docks and other property improvements from a "common area" north of her designated lot in the Trycove Subdivision in Midland County.[1]  The court also ruled that an association of property owners within the subdivision would be responsible for maintaining this common area.  On appeal, Couch contends that the trial court improperly delineated the boundaries of her property, failed to recognize her valid claim for adverse possession, acted without authority by ruling that the association of owners could govern the common area, and improperly ruled that an easement from the 1920s extended to the present day.  We affirm.

## I.  BACKGROUND

### A.  HISTORY OF SUBDIVISION

Trycove Subdivision is a part of "government lot 4" in Section 35 of Edenville Township.  Riverdale Farms owned the lot and, in the 1920s, conveyed the part of it existing below the 633-foot sea-level contour line ("the 633 contour line") to Wolverine Power Company so that Wolverine could build dams along the Tittabawassee River.  Although the Sanford Dam failed in 2020 and is in the process of being rebuilt, at the time of the commencement of the instant case, there was a strip of land between Sanford Lake (created by the dam) and the 633 contour line.[2]  As part of Riverdale's conveyance, it

> reserve[d] to itself, its successors and assigns forever, the perpetual non-exclusive right . . . to use the waters of the Tittabawassee River and its tributaries impounded by the dams . . . for domestic and farm purposes . . . and for purposes of boating, hunting and fishing, the right of ingress and egress for such purposes from adjacent lands owned or possessed . . . .

---

[1] The subdivision is normally situated to the east of Sanford Lake, although the lake is not present at the moment because of the 2020 failure of the Sanford Dam.

[2] Evidently, Sanford Lake was to be below the 633 contour line, but Wolverine wanted a buffer to be able to flood waters up to that level if necessary.

This reservation will be referred to as the "Riverdale Easement." The practical effect of the Riverdale Easement was that the land below the 633 contour line not submerged by water was owned by Wolverine but available for use by owners of land above the 633 contour line.

The parties agree that Riverdale conveyed its interest in government lot 4 to Horace Prettyman in 1938; that Prettyman, at the same time, conveyed his interest to Co-Ordinators, Inc.; that Co-Ordinators, Inc., conveyed its interest to F. E. and L. G. Mensing in 1944; and that, in 1946, the Mensings deeded the lot to Leonard and Jessie Hulse. The deed to the Hulses contained the following language: "including such rights and privileges as the grantors have therein with respect to the use of the river and the waters thereof and to go over and upon the lands of Wolverine Power Corporation." The Hulses recorded the Trycove Subdivision plat and created the subdivision out of government lot 4. The plat states that it "includes all land to the edge of the backwaters of the Sanford Dam." Of course, the Hulses only owned the land down to the 633 contour line because Wolverine still held the land below that line. The dispute in the present case involves lot 11, the land to the west of lot 11, and the land to the west of the horizontal part of Leonard Street. Leonard Hulse lived on lot 11 until his death in 1981.

The Hulses sold lots within the subdivision, and in 1959, they recorded an easement pertaining to land in "Trycove Subdivision and lying between the waters of Sanford Lake and the platted lots of the said Trycove Subdivision as shown on [the] plat." The easement was for "owners of lots in the Trycove Subdivision and their heirs and assigns" and provided for "[t]he right to go onto and cross said lands for the purpose of bathing in the waters of Sanford Lake and in a lawful and sportsman manner to boat and fish on any of the waters of said Sanford Lake." Thereafter, Wolverine deeded the land between the lake and waterfront lots to the respective owners. In particular, in 1969, Wolverine deeded to the Hulses "all that part of the following described land lying below . . . Contour 633: Lot 11 of Trycove Subdivision and also that land lying between water's edge elevation and the west boundary of Lot 11." Wolverine retained the right to flood the land up to the 633 contour line.

After Leonard Hulse's death, his heirs conveyed lot 11 "and also that land lying between water's edge elevation and the west boundary of said Lot 11" to Pamela Kay Clipper. Shortly thereafter, Clipper conveyed the land to Daniel and Elizabeth Mallek. In 1998, the Malleks conveyed the land to Gary and Linda Schwabe, and in 2010, Linda Schwabe conveyed the land to Couch. Meanwhile, Boyce Trusts became the successor to Wolverine, and after it stopped paying taxes, Midland County foreclosed on Boyce's property and conveyed it to the Sanford Lake Preservation Association, Inc. (the SLPA). The SLPA deeded the property back to the county during the pendency of this case.

B. PRESENT LITIGATION

This litigation arises from a dispute regarding the rights Couch has in land adjacent to her lot in the Trycove Subdivision. The diagram below is illustrative:



Couch owns lot 11. As documented above, lot 11's northernmost border abuts Leonard Street, and its westernmost border leaves plenty of space between the lot and the edge of Sanford Lake.

Couch contends that her rights extend beyond the confines of lot 11. Couch suggests that caselaw confers upon her rights up the center of an adjacent street and that the deed to her property confers upon her rights up to the water's edge. The following diagram demonstrates what Couch contends to be the proper borders of her land:



Couch has placed seawalls, fencing, and docks on land outside of lot 11 in a manner consistent with her understanding of her property rights. This litigation was brought due to Couch's actions in connection with what the other parties believe to be "common areas" which the

entire subdivision has the right to access. The trial court ultimately ordered couch to remove the seawalls, fencing, and docks, and this appeal followed.

## II. COUCH'S LAND INTEREST

Couch argues that the trial court erred by improperly determining her land interest. We disagree.

Trial court's decisions on summary disposition motions and the disposition of actions to quiet title are both reviewed de novo. *In re Rudell Estate*, 286 Mich App 391, 402-403; 780 NW2d 884 (2009). As a contract, the interpretation of the language in a deed is reviewed de novo. *Id*. Finally, issues of statutory interpretation are likewise reviewed de novo. *Id*.

### A. DEED

Couch owns lot 11 in the Trycove Subdivision, and the trial court was tasked with determining the meaning of "that land lying between water's edge elevation and the West boundary of said Lot 11" as set forth in Couch's deed. Jeremy Rosenbrock, a licensed professional surveyor, attested that he had been retained to ascertain the scope of this land and had, "[p]ursuant to the principles of professional surveying," determined that it encompassed an area achieved by continuing the northern boundary of lot 11 in a straight-line southwesterly manner toward Sanford Lake. Another surveyor, Jeffrey Wood, interpreted the boundaries in the same manner as Rosenbrock. Wood stated that interpreting the land boundaries in this manner, by extending the northern boundary line in a southwesterly manner in a straight line, "is consistent with [his] trade" and is "industry practice." He said that there was no question about the proper way to interpret the property lines.

A survey by Kevin Pomoville of Apex Land Surveyors, LLC, and commissioned by Couch's relative stated:

> [I]t appears in the case of lot 11 that the intended portion of the land between the lot and the water be defined along the north line by running west from the NW lot corner as evidenced by the existing old sea wall. However, a legal opinion is advised.

In other words, Pomoville disputed that the northern property line be extended in a *southwesterly* fashion to the water's edge as ascertained by Rosenbrock and Wood. Wood averred that the Pomoville survey was not correct. He also said that the phrase "a legal opinion is advised" will be used on a survey "[i]f you're unclear on the limits of the deed, or property ownership, or lines of occupation." In answers to interrogatories, Couch identified only the subdivision plat and the original deed conveyance in the chain of title (and not the Pomoville survey) as the evidence in support of her assertion that she owed land greater than that identified by the Rosenbrock and Wood surveys.

As stated in *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013):

A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10). A court may only consider substantively admissible evidence actually proffered relative to a motion for summary disposition under MCR 2.116(C)(10). [Quotation marks and citation omitted.]

The controlling intent for a deed is the intent expressed in the instrument, not any secret or unexpressed intent. *In re Rudell Estate*, 286 Mich App at 409. "The general rule is that courts will follow the plain language in a deed in which there is no ambiguity." *Farabaugh v Rhode*, 305 Mich 234, 240; 9 NW 2d 562 (1943).

Descriptions do not identify of themselves; they only furnish the means of identification. *They give us certain marks or characteristics*,—perhaps historical data or incidents,—*by the aid of which we may single out the thing intended from all others; not by the description alone, but by that explained and applied*. Even lands are not identified by description until we place ourselves in the position of the parties by whom the description has been prepared, and read it with the knowledge of the subject matter which they had at the time. [*Id*. (quotation marks and citation omitted; emphasis added).]

Rosenbrock and Wood, in "explaining and applying" the language of the deed, were steadfast in their conclusion that the phrase in question encompassed an area achieved by continuing the northern boundary of the lot in a straight-line southwesterly manner. Couch did not present the Pomoville survey in support of her assertion that the area was larger than that identified by Rosenbrock and Wood before the trial court or now on appeal. Even if she had, Pomoville essentially admitted to being unsure about his survey and therefore it did not create a genuine issue of material fact. Under these circumstances, there is no basis on which to overturn the court's adoption of the Rosenbrock and Wood conclusions.

Couch contends that she owns land extending into Leonard Street (the street abutting her lot to the north) on the basis of *Loud v Brooks*, 241 Mich 452, 456; 217 NW 34 (1928), in which the Michigan Supreme Court stated:

We hold the correct rule to be that a conveyance of land bounded on a highway, street, or alley carries with it the fee to the center thereof, subject to the easement of public way, provided the grantor at the time of conveyance owned to the center and there are no words in the deed showing a contrary intent, whether the dedication of the highway, street, or alley has been accepted or not, and whether it has been opened or not.

However, MCL 560.227a provides:

(1) Title to any part of the plat vacated by the court's judgment, other than a street or alley, shall vest in the rightful proprietor of that part. Title to a street or alley the full width of which is vacated by the court's judgment shall vest in the rightful proprietors of the lots, within the subdivision covered by the plat, abutting the street or alley. Title to a public highway or portion of a public highway that borders on, is adjacent to, or ends at a lake or the general course of a stream may vest in the state subject to section 226.

* * *

(3) If only part of the width of a street or alley, not extending beyond the center line, is vacated, title to the vacated part of the street or alley shall vest in the proprietor of the lots abutting the same.

(4) When title to any part of a vacated street or alley vests in an abutting proprietor, any future legal description of the abutting lot or lots shall include that part of the vacated street or alley.

This statutory scheme demonstrates that, with regard to platted land in subdivisions, parts of adjacent streets vest in the proprietors of abutting lots *when the streets are vacated*. As explained by the Michigan Supreme Court in *2000 Baum Family Trust v Babel*, 488 Mich 136, 152, 155; 793 NW2d 633 (2010), the owner of adjacent land retains a *reversionary* interest in a street that vests upon abandonment. No such abandonment has occurred in the present case, so Couch's contention that her property extends to the midpoint of Leonard Street is without merit.

Couch also cites *Morse v Colitti*, 317 Mich App 526, 541-543; 896 NW2d 15 (2016), wherein the Court extended the principles from *2000 Baum Family Trust* to a walkway and added that there was a present fee interest (not merely a reversionary fee interest) in the walkway feature, subject to easement rights of other landowners. Couch contends that *Morse* stands for the proposition that the law grants landowners "the fee to the center of an adjacent shared property features [sic]." However, at issue in *Morse* was a platted walkway. *Morse*, 317 Mich App at 532, 541-543. There is no platted feature at issue here aside from Leonard Street. We are not persuaded by Couch's reliance on *Morse*, which dealt with differently situated property features and a walkway.

Couch argues that the trial court improperly characterized the land west of Leonard Street and above the 633 contour line as owned by Edenville Township.[3] The court cited MCL 560.253 as authority for this conclusion, which provides in relevant part:

(1) When a plat is certified, signed, acknowledged and recorded as prescribed in this act, every dedication, gift or grant to the public or any person, society or corporation marked or noted as such on the plat shall be deemed sufficient conveyance to vest the fee simple of all parcels of land so marked and

---

[3] As discussed above, the land below this line is currently owned by Midland County.

noted, and shall be considered a general warranty against the donors, their heirs and assigns to the donees for their use for the purposes therein expressed and no other.

(2) The land intended for the streets, alleys, commons, parks *or other public uses as designated on the plat* shall be held by the municipality in which the plat is situated in trust to and for such uses and purposes. [Emphasis added.]

Couch contends that MCL 560.253 is inapplicable because the plat does not designate this land as anything. The land west of Leonard Street and above the 633 contour line is not platted as anything, and neither Couch's nor the court's interpretation appears tenable. The plat explicitly states that it encompasses "all land to the edge of the backwaters of the Sanford Dam," but then it shows a gap between Leonard Street and the water's edge, and it is not in dispute that some of this gap is above the 633 contour line. This "gap" on the plat is simply not assigned a designation. The crucial point for purposes of the present appeal, however, is that the court did not err by concluding that *Couch* does not own this land. We agree with the following statement made by the Leonard Street Parties[4] on appeal:

The trial court's delineation of land must be upheld as far as it stated what Couch owns—Couch owns Lot 11, the land between the water's edge of Sanford Lake and Lot 11 as described by the Rosenbrock and Woods surveys, and then a separate reversionary interest in Leonard Street, subject to the rights of others within the Trycove subdivision to make full use of the Leonard Street area.

In other words, whether the township owns the "gap" or not, the bottom line is that *Couch* does *not* own it. Therefore, Couch is not entitled to appellate relief in connection with the present litigation.[5]

## B. ADVERSE POSSESSION

Couch argues that the trial court improperly rejected her claim of adverse possession. We disagree.

The court concluded that the adverse-possession claim was not viable because of a foreclosure that occurred on the land below the 633 contour line. It had been owned by Boyce

---

[4] The Leonard Street Parties consist of the Leonard Street Association, Jared and Andrea Ayres, Jeff and Sharon Guernsey, Holly and Leo Kukla, and Sue Balcirak.

[5] Moreover, in 1959, the original subdivision platters (who owned the land above the 633 contour line) recorded an easement pertaining to land in "Trycove Subdivision and lying between the waters of Sanford Lake and the platted lots of the said Trycove Subdivision as shown on [the] plat." The easement was for "owners of lots in the Trycove Subdivision and their heirs and assigns" and provided for "[t]he right to go onto and cross said lands for the purpose of bathing in the waters of Sanford Lake and in a lawful and sportsman manner to boat and fish on any of the waters of said Sanford Lake." It seems that the "gap" land is, therefore, to be enjoyed by the subdivision as a whole.

-8-

Trusts, which failed to pay taxes, and after a foreclosure proceeding it was eventually conveyed to Midland County. A judgment of foreclosure extinguishes all recorded and unrecorded interests in the property foreclosed upon. MCL 211.78k(5)(e). This Court has noted that the statutory phrasing from MCL 211.78k(5)(e) "seems to embrace every conceivable property interest." *Antrim Co Treasurer v Dep't of Treasury*, 263 Mich App 474, 480-481; 688 NW2d 840 (2004), vacated on other grounds 475 Mich 901 (2006). Therefore, Couch could not have obtained the land below the 633 contour line by way of adverse possession, in light of the foreclosure on the bottomlands.

We note that a white picket fence that Couch alleges had been in place for many years until her father replaced it with a chain-link fence seems clearly to be, toward the east, above the 633 contour line. The court did not delineate, in its adverse-possession ruling, between land above and below this line. However, a review of Couch's claims below shows that she was claiming title to one large chunk of land, both below and above the 633 contour line—referring to it as "lands west of Lot 11"—by way of adverse possession. On appeal, too, she does not make any distinction, when discussing her adverse-possession claim, between land below the 633 contour line and land above the 633 contour line. She simply claims that she is entitled to the large chunk of land, leading to the water's edge, on the basis of adverse possession, and refers both to the fence line and to a seawall and boardwalk, stating that "[t]he installation and existence of the seawall/boardwalk and picket fence for many years was open and obvious." Clearly, the seawall and boardwalk are below the 633 contour line and within the foreclosed-upon land. Couch makes no attempt on appeal to address the effect of the foreclosure on her adverse-possession claim and does not argue that adverse possession applies only to a *part* of the land. Given all these circumstances and the way Couch frames her issue on appeal, we conclude that no appellate relief is warranted in connection with the adverse-possession claim.

## III. RIVERDALE EASEMENT

Couch argues that the Riverdale Easement dissolved when the Hulses platted the Trycove Subdivision. Alternatively, Couch argues that the Easement does not authorize the construction of docks.

Riverdale Farms originally owned the government lot from which Trycove Subdivision was platted. In the 1920s, it conveyed the part of the government lot existing below the 633 contour line to Wolverine Power Company (Boyce Trust's predecessor) so that Wolverine could build dams along the Tittabawassee River. As part of Riverdale's conveyance, it

> reserve[d] to itself, its successors and assigns forever, the perpetual non-exclusive right . . . to use the waters of the Tittabawassee River and its tributaries impounded by the dams . . . for domestic and farm purposes . . . and for purposes of boating, hunting and fishing, the right of ingress and egress for such purposes from adjacent lands owned or possessed . . . .

This reservation is referred to as the "Riverdale Easement."

Couch contends that the trial court erred by concluding that the Riverdale Easement remains in effect to this day and erred by concluding that it encompasses the placement of docks. As stated in *Wiggins v City of Burton*, 291 Mich App 532, 550; 805 NW2d 517 (2011):

> The scope and extent of an easement is generally a question of fact that is reviewed for clear error on appeal. Similarly, whether the scope of an easement has been exceeded is generally a question of fact. However, when reasonable minds could not disagree concerning these issues, they should be decided by the court on summary disposition as a matter of law. [Quotation marks and citations omitted.]

The court did decide this issue by way of summary disposition. As noted, "[a]ppellate review of a motion for summary disposition is de novo." *Spiek v Mich Dep't of Transp*, 456 Mich 331, 337; 572 NW2d 201 (1998).

Couch contends that the easement did not survive the platting process, but Couch provides no authority for this proposition. An appurtenant easement runs with the land. *Charles A Murray Trust v Futrell*, 303 Mich App 28, 42; 840 NW2d 775 (2013). "[I]f the easement in question relates in some way to a particular parcel of property, it is nearly always deemed appurtenant." *Penrose v McCullough*, 308 Mich App 145, 148; 862 NW2d 674 (2014).[6]

> If a dominant estate with easement rights is divided, all resulting parcels take a share in the easement as long as an unreasonable burden is not imposed upon the servient estate. Generally, a mere increase in the number of persons using an unlimited right of way to which the land is subject is not an unlawful additional burden. [*Morse*, 317 Mich App at 538 (quotation marks and citation omitted).]

Accordingly, the trial court did not err by concluding that the Riverdale Easement remained in effect.

Couch contends that the trial court erred by concluding that the easement provided for the placement of docks. In *Cabal v Kent Co Rd Comm*, 72 Mich App 532, 536; 250 NW2d 121 (1976), the Court stated, "We cannot quarrel with the trial judge's decision that the right of defendants to maintain docks is reasonably appurtenant to their easement to enjoy boating in the lake." While this Court is "not *strictly required* to follow uncontradicted opinions from this Court decided before November 1, 1990," these opinions are "considered to be precedent and entitled to significantly greater deference than are unpublished cases." *Woodring v Phoenix Ins Co*, 325 Mich App 108, 114-115; 923 NW2d 607 (2018). Similar to *Cabal*, the easement here specifically refers to boating, and we find the reasoning in *Cabal* persuasive. Couch cites *Delaney v Pond*, 350 Mich 685; 86 NW2d 816 (1957), to argue that the Riverdale Easement does not encompass the right to place docks. In *Delaney*, the Supreme Court agreed with the trial court that " 'permanent mooring [of] a boat' " was not necessarily included in the right to boat. However, it is important to note that *Delaney* involved an easement that did not expressly mention boating. *Id*.

---

[6] The other type of easement—an easement in gross—is for the benefit of a specific person. *Id*.

at 686-688.[7] Importantly, the Court's concern in *Delaney* was with the permanent storage of boats on or placing of stakes into the easement *land*, given that the easement in that case involved only "access" to a river and lake. *Id*.[8] The easement in the present case is far more expansive. The trial court did not err by concluding that the easement at issue here included the right to place docks. In addition, the dispute here is over an easement on land that Couch does not own; the bottomlands in which the docks are placed (or will be placed once the lake is reestablished) are owned by the county.

## IV. COURT'S RULING REGARDING THE LEONARD STREET ASSOCIATION

Couch argues that the trial court improperly made the equitable ruling that the Leonard Street Association should govern the common area. We agree.

This Court reviews issues of equity de novo. *Tkachik v Mandeville*, 487 Mich 38, 44-45; 790 NW2d 260 (2010).

A court may exercise its discretion to grant equitable relief when a legal remedy is not available. *Id*. at 45. "Equity allows 'complete justice' to be done in a case by 'adapting its judgments to the special circumstances of the case.' 27A Am Jur 2d, Equity, § 2, at 520–521." *Tkachik*, 487 Mich at 46 (alterations omitted). As our Supreme Court said in *Spoon-Shacket Co v Oakland Co*, 356 Mich 151, 163; 97 NW2d 25 (1959), "One of the glories of equity jurisprudence is that it is not bound by the strict rules of the common law, but can mold its decrees to do justice amid all the vicissitudes and intricacies of life." (Quotation marks and citation omitted.)

In this case, the trial court found that there was need for some formal governance over the common area to provide for proper maintenance and prevent discord among the property owners. To that end, it exercised its equitable powers to appoint the Leonard Street Association as the governing body. Couch cites *Conlin v Upton*, 313 Mich App 243; 881 NW2d 511 (2015), to support its argument that the court's ruling was erroneous. In that case this Court stated:

> Under Michigan's common law, a property owner normally cannot be contractually bound by a covenant regulating the use of his or her real property without his or her agreement to the covenant. Therefore, a group of property owners cannot impose building and use restrictions on a neighboring property owner without his or her consent. [*Id*. at 259.]

Couch also cites *Eveleth v Best*, 322 Mich 637, 642; 34 NW2d 504 (1948), wherein the Court stated that "[c]ourts of equity do not aid one man to restrict another in the use to which he may put his property unless the right to such aid is clear." (Quotation marks and citation omitted.)

---

[7] The easement at issue in *Thies v Howland*, 424 Mich 282, 288-289; 380 NW2d 463 (1985), another case cited by Couch, was also far different from the one at issue in this case.

[8] It is notable that in *Cabal* this Court cited *Delaney*, see *Cabal*, 72 Mich App at 536-537, but did *not* conclude that *Delaney* required a finding in *Cabal* that docks were not encompassed by the easement.

However, the Leonard Street Association was not empowered to regulate *Couch's property*; it was empowered to regulate the common area.[9] Because the court's delegation of authority to the Leonard Street Association did not grant it any authority over Couch's property, this caselaw is inapplicable.

Nevertheless, while Couch does not own the property, Couch does have an interest in its governance. On this record, we are left with questions regarding the court's appointment of this organization. In particular, it is not clear what evidence supported the court's decision to appoint this association, and there is not enough information regarding its formation, governance, and membership. Accordingly, we vacate this portion of the decision and remand for additional proceedings.

## V. CONCLUSION

We vacate the court's decision to appoint the Leonard Street Association to be the governing body for the common area. In all other respects, we affirm. This case is remanded for additional proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Allie Greenleaf Maldonado
/s/ Jane E. Markey
/s/ Kirsten Frank Kelly

---

[9] Couch makes a passing reference to the First Amendment, suggesting that this decision "likely violates" the right of association. However, this one-sentence argument is cursory and undeveloped. See *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998) ("An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority."). Accordingly, we decline to consider it.